Argued May 24, affirmed July 26, motion to retax costs allowed November 22, 1921.

IN RE WILL OF HENRY L. PITTOCK, DECEASED.
LEADBETTER v. PRICE ET AL.

(199 Pac. 633.)

**Wills—Striking of Allegations from Petition in Proceeding to Contest Will Held Harmless.**

1.  In a proceeding to contest the validity of a will, the striking from the original petition of allegations that the will was void because trustees were given an unrestricted and unlimited discretion as to the accumulation of the income, because the beneficiaries of the trust were not specified with sufficient certainty, and because its provisions were in contravention of statute and against public policy, was not harmful error, where the questions raised by such allegations were discussed on appeal, as they were only conclusions of law and the questions thereby raised appeared on the face of the writing.

**Wills—Suit to Contest Validity Held Within Jurisdiction of Circuit Court, Whatever Its Nature.**

2.  Notwithstanding Article VII, Section 12, Const., giving County Courts the jurisdiction pertaining to probate courts, under Sections 1a and 2b, vesting the judicial power in the Supreme Court and such other courts as may be created by law and continuing the courts and their jurisdiction until otherwise provided by law, and act of February 17, 1919 (Laws 1919, c. 59; Or. L., §§ 3142–3140), abolishing County Courts in certain counties, the Circuit Court of

such a county had jurisdiction over a proceeding to contest the validity of a will, whether considered as a proceeding to determine its authenticity or as a suit to construe the will.

#### Evidence—Judicial Notice Taken That Statute Applies to Specified County.

3. The court will take judicial notice that act of February 17, 1919 (Laws 1919, c. 59; Or. L., §§ 3132–3140), abolishing the County Court and the office of the county judge and transferring the judicial jurisdiction, power, and authority of county judges and County Courts to the Circuit Court in judicial districts comprising only one county having over 100,000 population, applies to Multnomah County.

#### Wills—Evidence Merely Showing Trustees had Testator's Confidence Insufficient to Show Undue Influence.

4. Evidence showing only that one of the trustees vested with extensive powers under the will of a testator was for many years manager of the newspaper published by a corporation of which the testator held the majority of the stock, and that the other was the testator's private secretary, and therefore that they had his confidence and the opportunity to exercise such influence as they possessed, was insufficient to establish undue influence, where the evidence was convincing that they never exercised or attempted to exercise influence over him in making his will, and that, on the contrary, the initiative came from him, and that he had much more influence over them than they had over him.

#### Wills—Undue Influence Actually Exercised and Pushed to Extent That Will was not Testator's must be Shown.

5. It is not sufficient to show that a defendant had an opportunity to exercise undue influence over a testator, but it must also appear that the influence was actually exercised and pushed to such an extent that the resultant will was not that of the testator but that of the party procuring its execution.

#### Wills—Cannot be Attacked as Result of Illegal Contract When Such Contract not Pleaded.

6. A provision of a will of a majority stockholder in a newspaper corporation for the retention by trustees of the manager and managing editor cannot be attacked as the result of a contract illegal and against public policy, in the absence of any allegation of an illegal contract void as against public policy.

#### Trusts—Bequest by Majority Stockholder to Trustees Directed to Elect Themselves as Directors, etc., Held not Illegal.

7. Where a majority stockholder in a newspaper corporation bequeathed his property to trustees, a provision that the stock in such company should not be sold during the trust period of 20 years and that the trustees should vote it in favor of themselves as directors, and stating the testator's desire that the manager and managing editor should be retained, was not illegal, where there was nothing to show that the testator acted on account of any sinister motive or by reason of any corrupt consideration or advantage accruing to himself and not equally accruing to the minority stockholders.

Corporations—Bequest of Stock in Trust With Directions as to Voting not "Voting Trust."

8. A bequest of the majority of the stock in a corporation to trustees, with directions to vote the stock for themselves as directors during the term of the trust, was not a "voting trust"; there being no combination of stockholders.

Perpetuities—Bequest to Trustees for Twenty Years Held not to Constitute.

9. A will bequeathing property to trustees to hold in trust for twenty years and make certain monthly payments to the testator's widow and children, and after all debts and obligations had been paid, or when a sufficient amount should be on hand to pay them, to pay 50 per cent of all cash on hand in excess of such reserve and such amount as would be needed to preserve the estate to the widow, or if she should not be living to the children, did not create a perpetuity, as it did not purport to perpetuate the limitation upon the property for more than any life then in existence and twenty-one years thereafter.

Corporations—Agreements as to Voting Stock not Necessarily Void.

10. Agreements between stockholders to vote their stock in a certain way are not necessarily void *per se*, in the absence of any element of private personal gain to accrue to the contracting parties and not to be enjoyed by other members of the corporation.

Wills—Request That Trustee Holding Corporate Stock Keep Certain Employees not Mandatory.

11. Where the owner of a majority of the stock of a newspaper corporation bequeathed it with other property to trustees for twenty years and directed that such stock should not be sold and that the trustees should vote it in favor of themselves as directors, and stated that it was his "desire" and "request" that the manager and managing editor of the newspaper should be retained, the will was not mandatory as to their retention, especially where other provisions of the will gave the trustees full and complete power and authority over the estate and power to vote the stock in various corporations.

Wills—Trust Held not Void for Uncertainty.

12. Where a will, reciting that it was done to avoid as far as possible any loss or depreciation of the estate, gave all of the testator's property to trustees for twenty years, with full and com-

8. Validity and effect of provision in will to control voting power of corporate stock, see note in 9 A. L. R. 1242.

9. Postponing distribution until payment of debts or settlement of estate as violating rule against perpetuities, see note in 13 A. L. R. 1033.

10. For authorities discussing the question of validity of agreement to control the voting power of stock, see notes in 14 Ann. Cas. 938; 21 Ann. Cas. 1297; Ann. Cas. 1915D, 800; Ann. Cas. 1917B, 373; Ann. Cas. 1917E, 594; Ann. Cas. 1918E, 252; 16 L. R. A. (N. S.) 1136; 31 L. R. A. (N. S.) 1186.

plete power and authority over the estate and with the right to full and complete possession and control and with directions to keep surplus funds invested in good securities, and directed them to pay monthly allowances to testator's wife and children and their descendants by right of representation and to accumulate enough to pay off debts and obligations and then disburse the excess to the wife and children, and, upon the termination of the trust at the end of the 20 years, to divide the property among testator's descendants, the trust was not void for uncertainty.

### ON MOTION TO RETAX COSTS.

**Costs and Disbursements must be Authorized by Statutes.**
13.  No costs or disbursements can be allowed in any court unless authorized by statutes.

**Courts—Rule of Court must Yield to Contradictory Statute.**
14.  A rule of the Supreme Court must yield to a statute to which it is in direct contradiction.

**Costs—Clerk of Supreme Court cannot Disallow Item of Disbursements of Bill to Which There has Been No Objection.**
15.  Under Section 569, Or. L., providing that costs and disbursements shall be taxed and allowed by the court or judge thereof, and that the statement of disbursements and costs shall be entered as of course by the clerk as a part of the judgment or decree, unless objections are filed, and that the statement of disbursements and objections thereto constitute the only pleadings required on the question of taxation and allowance of costs and disbursements, and under Section 570, empowering the court to pass upon objections, and in view of Sections 161, 542, 561, 565, 566, and notwithstanding rules of the Supreme Court Nos. 29 and 30, the clerk of the Supreme Court had no right to disallow disbursements for printing of brief where no objection thereto had been filed, since neither the court nor the clerk has arbitrary power to disallow any item of disbursements against which no objection has been filed except with respect to filing fees.

From Multnomah: GEORGE TAZWELL, Judge.

In Banc.

This is a proceeding to contest the validity of the will of Henry L. Pittock, deceased, on the petition of his daughter, Caroline P. Leadbetter, in which the relief desired is to set aside, annul and cancel the testamentary document, with a view of distributing the estate according to the statute of descents, as in a case of intestacy. The original petition stated the death of the deceased, that at the time thereof he was a resident and inhabitant of Multnomah County, Oregon,

having real and personal property therein, gives the names and residences of the heirs, and avers that about February 17, 1919, a writing purporting to be his will was admitted to probate. The petition then goes on to allege that the will mentioned "should be set aside and annulled for the following reasons," among others these:

"(c) That said paper writing is void as a last will and testament, because the trustees therein named are vested with unrestricted and unlimited discretion as to whether they shall accumulate the income arising from the estate of said testator and keep intact the *corpus* thereof during the period of the trust purported to be created by said paper writing, or, whether they shall sell the assets of said estate and make distribution thereof and of the income arising therefrom within the period of said alleged trust.

"(d) That said paper writing is void as a last will and testament, because it does not specify, with sufficient certainty, the beneficiaries of the trust therein purported to be created.

"(e) That said paper writing is void as a last will and testament because it is in contravention of the statutes of the State of Oregon and against public policy, particularly in that Clause B of paragraph second thereof directs said trustees to vote the stock of the Oregonian Publishing Company, owned by said decedent at the time of his death, in favor of themselves as directors of said company for the period of the trust purported to be created by said paper writing to wit: twenty years."

The Circuit Court, in which this proceeding was instituted, on motion of the proponents of the will, struck out paragraphs C, D, E, above quoted, whereupon the contestant filed an amended petition. The allegations about the death of the decedent, the heirs and the presentation and admission to probate

of the will are substantially the same as in the original pleading. It goes on to state with a wealth of verbiage that the trustees were intimately connected with the deceased as confidential advisers; that at the time of the execution of the will the decedent was eighty-one years of age; that the trustees named therein had acquired great influence over him; and that, conspiring, intending and devising to secure large power, influence, emoluments, salaries and commissions as executors of the last will and testament and as trustees of his estate amounting approximately to $8,000,000, the individuals named as trustees so persuaded and overcame the will, free agency, volition and judgment of the deceased that their will was substituted for his and the paper mentioned, for the reasons foregoing, was not and did not represent the will of the decedent.

It is averred also in substance that the trustees and others to the petitioner unknown unduly influenced and induced the deceased to keep secret the fact that he had signed the paper. The resultant of all the allegations of the amended petition is concentrated in the eleventh paragraph thereof, reading thus:

"That said provisions of said will creating said trust and conveying to said O. L. Price and C. A. Morden all of the estate of decedent and giving to said persons unrestricted and unlimited discretion as to the accumulation of the income arising from the estate of deceased and keeping intact the *corpus* thereof during the period of twenty years as provided in said paper writing, or selling the assets of said estate and making distribution thereof and the income arising therefrom within said period of twenty (20) years, and failing to specify with sufficient certainty the beneficiaries of said trust attempted to be created by said paper writing, and

directing the said persons to vote for themselves during the period of said alleged trust and to elect and retain said C. A. Morden as manager of the Oregonian Publishing Company are illegal and void, against public policy and in contravention of the statutes of the State of Oregon."

It is alleged that the decedent was ignorant of the legal effect of the provisions of the will and that he relied upon the representations of the trustees and did not seek independent advice; that he would not have executed the will or created the trust mentioned if he had known or been advised that the writing in the particulars mentioned, or in any of them, was illegal and void. The prayer is to the effect that the will be set aside and canceled and an administrator be appointed to take charge of the estate. A copy of the will is attached to the petition, marked Exhibit "A," and reads as follows:

"Know All Men, that I, Henry L. Pittock, of Portland, Multnomah County, State of Oregon, of the age of 81 years, being of sound and disposing mind and memory, and not acting under duress, menace, fraud or undue influence of any person whomsoever, do make, publish and declare this my last will and testament in manner and form following, to wit:

"First: It is my will, and I do order that all my just debts and funeral expenses be duly paid and satisfied as soon as can conveniently be done after my decease.

"Second: In order to avoid, as far as possible, any loss or depreciation which might be caused by any sudden changes and to preserve my estate, I hereby give, devise and bequeath unto C. A. Morden and O. L. Price, both of Portland, Ore., all of my property, real, personal and mixed, of which I may die seized or to which I may be entitled, including property held in trust for me and after acquired property, wheresoever the same may be located to be

held by them in trust for a period of twenty (20) years from the date of my decease for the following purposes, to wit:

"A.   The trustees shall have full and complete power and authority over my estate, they shall have full and complete possession and control of same, they shall keep the surplus funds invested in good securities. I grant unto them full power and authority to sell at public or private sale, as they may see fit, any of my property, except as herein otherwise provided, upon such terms and conditions as to them shall seem meet and for any purpose whatever; and I exonerate any purchaser from the necessity of seeing to the due application of the proceeds of sale, in making such sale said trustees shall not be obliged either to obtain the authority or consent or confirmation of any court therefor or thereof, either before or afterwards or to make any report thereof. They shall have power and authority to borrow money and bind my estate for the repayment thereof and to loan or advance money from my estate either with or without security when they shall deem it necessary for the protection of my estate. They shall have power to vote my stock in the various corporations at all meetings of the stockholders of such corporations and shall have all powers incident to the ownership of such stock.

"B.   None of my stock in the Oregonian Publishing Company shall be sold, but shall be held intact during the entire period of this trust, I direct that my trustees shall vote said stock in favor of themselves as directors of said corporation, and it is my desire and I request that C. A. Morden shall be elected manager of The Oregonian and shall be retained as such, and that Edgar B. Piper shall be retaiᵃed as managing editor of The Oregonian until he shall become incapacitated or until he may voluntarily resign.

"C.   None of my stock in the Crown-Willamette Paper Company shall be sold, but shall be held intact during the entire period of this trust.

"D. None of my stock in the Northwestern National Bank of Portland, Oregon, shall be sold unless all of my stock in the Northwestern Fidelity Company shall also be sold at the same time, or unless all of my stock in the Northwestern Fidelity Company shall have been previously sold.

"E. My trustees shall pay to my wife, Georgiana M. Pittock, if she shall survive me, the sum of $1,000 monthly during her lifetime or until the termination of this trust. They shall also pay the sum of $500 monthly to each of my five children, namely: Susan Emery, Fred F. Pittock, Kate P. Hebard, Caroline P. Leadbetter and Louise Gantenbein, during their lifetime or until the termination of this trust; provided, that if any of my said children should not survive me or should die before the expiration of this trust, such amount as would otherwise have gone to such deceased child shall be paid to the then living heirs of the body of such deceased child by right of representation, and in the event such deceased child shall leave no living heirs of his or her body then the payment which would otherwise have gone to such deceased child shall cease upon the death of such child.

"F. When all of my debts and obligations shall have been paid or when a sufficient amount of cash shall be on hand to pay the same, I direct my trustees to pay semi-annually thereafter fifty (50) per cent of all cash on hand in excess of such reserve and in excess of such amount otherwise needed to preserve my estate, to my said wife, if living, and if she shall not then be living said amount shall be paid semi-annually, share and share alike to my five children during their lifetime or until the termination of this trust, provided that if any of my said children shall not then be living the payment which would otherwise go to such deceased child shall go to the then living heirs of the body of each deceased child by right of representation and in the event that such deceased child shall leave no living heirs of his or her body, such payment shall cease. It must be understood that when I refer to 'my

debts and obligations' I mean not only my direct obligations, but all mortgages either upon my own property or upon property in which I am jointly interested and all obligations of the Northwestern Fidelity Company so long as my stock in said company remains unsold.

"G. Upon the termination of this trust, to-wit: Twenty (20) years after the date of my decease, all the property remaining in the hands of my trustees shall be turned over to my said wife, if living, to be held by her during her lifetime, and upon her death to go to my children as hereinafter provided for in case my said wife shall not be living at the termination of this trust; and in the event my said wife shall not be living at the termination of this trust all the property remaining in the hands of my trustees shall be turned over to and become the property of my then surviving children, share and share alike, provided that if any of my five children shall not then be living but shall leave living heirs of his or her body, the proportion of said property which would otherwise have gone to such deceased child shall go to the then living heirs of the body of such deceased child by right of representation.

"H. If either of my trustees above named shall die, resign or become incapacitated either before or after my decease, the survivor or remaining trustee shall act alone, and in the event both of said trustees should die, resign or become incapacitated, I hereby appoint the Portland Trust Company of Oregon to fill such vacancy and to act alone. It is understood that wherever and whenever in this will I have referred to 'trustees' it shall mean the trustees herein named, the survivor or successor.

"Lastly, I nominate, constitute and appoint my wife, Georgiana M. Pittock, to be the executrix and O. L. Price to be the executor of this, my last will and testament, to act jointly and without bonds; in the event of the death or resignation of either of the above then the survivor shall act alone. I hereby revoke all other legacies and wills by me made and declare this and no other to be my last will and

testament. I direct that no bond shall be required of the trustees herein named or of the survivor or successor.

"In witness whereof I have hereunto set my hand and seal this 23rd day of August, A. D. 1916.

"HENRY L. PITTOCK. (Seal)"

The attestation by the witnesses is in the usual form and is consequently omitted.

The answer admits the allegations about the death, relationship of the heirs and the admission of the will to probate, but otherwise denies the petition *in toto*. As new matter the answer avers the death of the decedent, his residence in Multnomah County, Oregon, at the time of his death; that he made a will of date August 23, 1916; that he signed the same in the presence of two named witnesses, who then and there at his request and in his presence signed the same as witnesses, and he published the same as his will; that he was in every respect competent to make the will; that his wife and O. L. Price were named as executors, but that the wife had died prior to the testator's death; and that the will was admitted to probate, and letters testamentary were issued to O. L. Price, who entered upon the discharge of his duties as executor, and ever since has been and still is such executor. The answer prays for the admission of the will to probate in solemn form and that the second amended petition to revoke the same be dismissed.

The reply denies every allegation of new matter in the further and separate answer, except as stated, admitting the death of Pittock, his residence and his estate situated in Multnomah County, and prays for the same relief as asked in the petition.

After hearing the testimony and argument of counsel the Circuit Court denied the petition and

entered a decree admitting the will to probate in solemn form, establishing the same as the last will and testament of the testator, confirming also the appointment of O. L. Price as executor and awarding costs against the petitioner and she has appealed.                              AFFIRMED.

For appellant there was a brief over the names of *Messrs. McAdoo, Cotton & Franklin, Messrs. Cake & Cake* and *Mr. L. A. Liljeqvist,* with oral arguments by *Mr. W. M. Cake* and *Mr. L. A. Liljeqvist.*

For respondents there was a brief over the names of *Mr. Charles H. Carey, Mr. James B. Kerr, Mr. John F. Logan* and *Mr. D. P. Price,* with oral arguments by *Mr. Carey, Mr. Kerr* and *Mr. Logan.*

BURNETT, C. J.—1, 2. No harmful error resulted in striking out of the original petition the parts thereof above quoted, for they were only conclusions of law and the questions raised by them appear on the face of the writing and have been discussed in our presence. A great deal of space was taken in the briefs and much attention devoted in the argument, to the matter of probate jurisdiction, the proponents contending that the sole question which can be considered in this proceeding is whether or not the will was the authentic document whereby the testator undertook to dispose of his property, while the petitioner maintains there is involved not only the decedent's freedom from undue influence in the execution of the document, but also the validity of the instrument as a matter of law.

Referring to Article VII of the Constitution of this state as it now stands, we find that by Section 1a thereof it is provided that:

"The judicial power of the state shall be vested in one Supreme Court and such other courts as may from time to time be created by law."

This was part of the amendment of 1910, which also provided in Section 2b that:

"The courts, jurisdiction and judicial system of the State of Oregon, except so far as expressly changed by this amendment, shall remain as at present constituted, until otherwise provided by law."

3. The argument seems to have proceeded on the assumption that throughout the state the old system prevailed as described in the original Constitution, whereby the County Court "shall have the jurisdiction pertaining to probate courts": Section 12, Article VII. The basis of the argument would be sound, had it not been for the provision by law embodied in the act of February 17, 1919, codified as Sections 3132–3140, Or. L. That statute provided in substance that in every judicial district comprising only one county having over 100,000 population, there should be elected one circuit judge in addition to those then holding office in such district; that he should sit in a department to be designated by rule of the Circuit Court by an appropriate number, and be known as the department of probate and that the judge of such department should, in addition to the duties prescribed in the act, perform the general duties of a judge of the Circuit Court. The County Court of such districts and the office of county judge were abolished, and upon the taking effect of the act all judicial jurisdiction, power and authority of the county judges and County Courts, as distinguished

from the power and jurisdiction as exercised in the transaction of county business was conferred upon the Circuit Court of the judicial district comprising such county. The act goes on to say also, in substance, that in any proceeding or cause over which by existing laws the County Court has jurisdiction, all of which are by the provisions of the act transferred to and heard by the Circuit Court, the procedure and practice shall be governed by the existing laws applicable to such proceeding without any change, except that appeals may be taken direct to the Supreme Court. The court will take judicial notice that the act applies to Multnomah County, in the Circuit Court of which this proceeding was instituted.

The jurisdiction of the Circuit Court was not in any respect lessened or restricted by the enactment mentioned. Its powers were increased by the addition of probate jurisdiction. The conclusion, therefore, is that so far as jurisdiction is concerned, and whether we consider this proceeding as merely a contest of a will to determine its authenticity or whether we treat it as a suit to construe the will, the tribunal before which the proceeding was had was possessed of full jurisdiction to hear and determine the questions involved. It is true that the original judicial scheme was to continue under the new Constitution until otherwise provided by law, but the act of February 17, 1919, has effected the necessary provision for change. Having before us, then, for review, a decision of a court having all the necessary original jurisdiction to consider any question which might be litigated, we proceed briefly to scan the pleadings upon which the proceeding is based.

Reduced to its lowest terms, the effort of the petitioner is to set aside the will on the ground that it was the product of undue influence exercised over the testator by the trustees named in the will, whereby in fact it was their disposition of the property that was embodied in the will, instead of that of the testator, so that their will was substituted for his; and further, that the result achieved was a will which is void on its face for reasons which were assigned in the original petition and re-embodied in paragraph 11 of the amended petition already quoted.

As to the mental capacity of the testator, no question is made, and it is sufficient on that feature to dismiss the matter with a quotation from the testimony of the petitioner herself:

"Q. There never was any question in your mind, was there, but what your father was in possession of all his mental faculties up to the time of his death?

"A. No. There never was any question about that. He was in full possession of all of his faculties to within a couple of hours before his death."

4, 5. As to the matter of undue influence, the testimony goes no further than to show that for some years the defendant Morden had been in the employ of the Oregonian Publishing Company, officiating as manager of the newspaper published by that corporation, of which the decedent held the majority of the stock, and that for a like period the defendant O. L. Price had been the private secretary of the testator, who had large business interests, having accumulated a fortune estimated in millions of dollars. These two defendants manifestly had the confidence of the testator and had opportunity to exercise over him such influence as they pos-

sessed. This is the utmost that the testimony shows. But the evidence is convincing that at no time or place did either of the defendants exercise or attempt to exercise any influence over the decedent in the matter of making his will. On the contrary, the testimony is clear that the initiative in the matter came from him and that the will was the product of his own mind and of his own dictation, without the least suggestion from anyone, so far as the record discloses, about what the document should contain or what disposition should be made of his property. In other words, as disclosed by the record before us, it is apparent that he had very much more influence over the defendants than they had over him; that his word was the law of his business and that it was theirs to obey and not to influence or dictate. On the question of undue influence, it is not enough to show that the defendant had an opportunity to exercise such influence, but it must also appear that the influence was actually exercised, and not only so, but that it was pushed to such an extent that the resultant will was not that of the testator but that of the parties procuring its execution: *Hubbard* v. *Hubbard,* 7 Or. 42; *Estate of Dolbeer,* 153 Cal. 652 (96 Pac. 266, 15 Ann. Cas. 207); *In re Shell's Estate,* 28 Colo. 167 (63 Pac. 413, 89 Am. St. Rep. 181, 53 L. R. A. 367); *Ginter* v. *Ginter,* 79 Kan. 721 (101 Pac. 634, 22 L. R. A. (N. S.) 1024).

The principal point of attack on the will is what we may call for convenience the "Oregonian clause," reading thus:

"None of my stock in the Oregonian Publishing Company shall be sold, but shall be held intact during the entire period of this trust, I direct that my trustees shall vote said stock in favor of themselves

as directors of such corporation, and it is my desire and I request that C. E. Morden shall be elected as manager of the corporation and shall be retained as such, and that Edgar B. Piper shall be retained as editor of the Oregonian until he shall become incapacitated or until he may voluntarily resign.''

6. The effort of the pleader is to show, not that this will was the product of any corrupt agreement, but that it is void upon its face, no matter how pure the motive of the maker. The argument by the petitioner, and she devoted much attention in the evidence trying to prove the same, is that without consulting the minority stockholders, Mr. Pittock, being the owner of two-thirds of the stock of the Oregonian Publishing Company, for the purpose of retaining control of the paper, perpetuating his policies and directing its policy, management and board of directors for twenty years after his death and to keep Piper as editor and Morden as manager from leaving him, entered into an agreement with Piper to have the corporation pay him an increased salary and to keep him in his position as managing editor until Piper should become incapacitated or voluntarily resign, but not exceeding twenty years after Mr. Pittock's death, and that he carried out his part of this agreement by directing his trustees to vote for themselves as directors and requesting them to elect Morden as manager and to retain Piper as editor. Further, according to her brief, the petitioner insists that this agreement is null and void, illegal and contrary to public policy. No hint of such an agreement is found in the pleadings.

7. So far as the petition is concerned it might be called a demurrer to the sufficiency of the will on the ground that it carried upon its face defects fatal to its validity. A great many cases have been cited

where combinations have been entered into by stockholders among themselves whereby for personal advantages not to be shared in by other stockholders they sought to dictate the policy of the corporation of which they were members. That is not the present case. We have before us an individual stockholder dealing only with his own property, exercising an attribute of such property, that of testamentary disposition. It is not made to appear by the pleading that he so disposed of it on account of any sinister motive or by reason of any corrupt consideration or advantage accruing to himself which did not equally inure to the benefit of the minority stockholders. The vicious principle of illegal combinations of directors to pursue certain policies generally for their own aggrandizement seems to be that each surrenders in advance his individual judgment irrespective of the good of the corporation or the rights of other stockholders. The essence of the fault lies in the combination which cannot exist where a single majority stockholder for himself and and in the management of his own property formulates a certain corporate policy and undertakes to carry it out. "Of the general proposition that certain kinds of conduct not criminal in any one individual may become criminal if done by combination among several, there can be no doubt. The distinction is based on sound reason, for a combination may make oppressive or dangerous that which, if it proceeded only from a single person, would be otherwise; and the very fact of the combination may show that the object is simply to do harm and not to exercise one's own just rights": 2 Beach on Private Corporations, § 854.

Some of the precedents cited by the petitioner are here noted: In *Scripps* v. *Sweeney,* 160 Mich. 148 (125 N. W. 72), it is held, according to the syllabus, that:

"The execution of a contract between four of the directors and stockholders of several corporations holding a majority of stock in each, without the consent of other stockholders, for purposes of personal gain, containing provisions for the continued employment of one of the contracting parties as manager at a fixed salary, and determining the business policy of the several corporations, is contrary to public policy and may not be enforced specifically."

In that case Scripps and Sweeney were leading stockholders in several newspaper corporations. In effect they, while occupying a position of trust, were contracting with each other for their own personal gain at the expense of the corporation, and consequently to the injury of other stockholders. Here, however, if contracting at all, Pittock was bargaining with strangers, or at least nonstockholders so far as appears, and was carrying out with his own property what he had a right to do, if he had lived.

In *Manson* v. *Curtis,* 223 N. Y. 313 (119 N. E. 559, Ann. Cas. 1918E, 247), a section of the syllabus reads thus:

"It is not illegal or against public policy for two or more stockholders owning the majority of shares of stock of a corporation to unite upon a course of corporate policy or action or upon the officers whom they will elect. An ordinary agreement among a minority in number but a majority in shares for the purpose of obtaining control of the corporation by the election of particular persons as directors is not illegal. Agreements upon a sufficient consideration between them, of such intendment and effect, are valid and binding, if they do not contravene any ex-

102 Or.—12

press charter or statutory provision or contemplate any fraud, oppression or wrong against other stockholders or other illegal object."

The vice upon which the court condemned the agreement in question consisted in the express stipulation that the president of the corporation should be only nominally so; that no interference with plaintiff's policy as manager should be tolerated; and that in effect the board of directors should be mere dummies, whereas the statute required that the affairs of the corporation should be controlled by the directors either in person or by subordinates under their authority. In the instant case the testator proposed to work out his policy by the legal election of directors by a majority of the stock which he himself owned and would have had a right to vote in that way without question, if he had lived.

In *Funkhouser* v. *Capps* (Tex. Civ. App.), 174 S. W. 897, it was held that a contract pooling what constitutes a majority of corporate stock on condition that the same shall be voted so as to put one of the parties in the management of the company with certain advantages in sale of his stock on severance of his relations with the concern, is void as against the Texas statute giving to the directors the general management of the affairs of corporations. In that case, as in others, one of the conditions of the agreement was to give to one of the parties thereto a private advantage not enjoyed by other members of the corporation. The same vicious element appeared in *Gage* v. *Fisher*, 5 N. D. 297 (65 N. W. 809, 31 L. R. A. 557), where it was decided that a contract to allow another to control the voting of stock based upon a promise of one who is to control such stock to secure for the owner of the stock an office in the

corporation, is illegal. So, in *Gilchrist* v. *Hatch* (Ind. App.), 100 N. E. 473, it is said that:

"As a general rule a contract by a director or a majority stockholder of a corporation whereby he undertakes in consideration of a private benefit or advantage accruing to himself, to secure the appointment of another to a lucrative office or a position of profit in the corporation, is against common honesty, and therefore against public policy."

In *Guernsey* v. *Cook*, 120 Mass. 501, the defendants, owners of a majority of the stock of a corporation, agreed to make the plaintiff treasurer of the company in consideration of his taking part of the defendants' stock. The court there said, among other things:

"The contract if reasonably susceptible of two meanings, one legal and the other not, must indeed receive an interpretation which will support rather than defeat it and the presumption is in favor of its legality. But this contract necessarily implies that the defendant intended to derive and the plaintiff intended to give him a private advantage not shared by the other stockholders in consideration of his election as treasurer. * * * It was the purpose and effect of the contract to influence the defendant in the decision of a question affecting the private rights of others by considerations foreign to those rights. The promisee was placed under direct inducement to disregard his duties to other members of the corporation who had a right to demand his disinterested action in the selection of suitable officers. He was in a relation of trust and confidence which required him to look only to the best interest of the whole, uninfluenced by private gain. The contract operated as a fraud on his associates."

All through the authorities cited by the petitioner runs the vein of pooling among a group of stockholders whereby they conspired either to seek some

private advantage not common to other members of the corporation, or to pass the control of the concern to others than the directors in whom the statute vests the management. Such instances are found in *Woodruff* v. *Wentworth*, 133 Mass. 309; *Hampton* v. *Buchanan*, 51 Wash. 155 (98 Pac. 374); *Jackson* v. *Hooper*, 76 N. J. Eq. 592 (75 Atl. 568, 27 L. R. A. (N. S.) 658); *Luthy* v. *Ream*, 270 Ill. 170 (110 N. E. 373, Ann. Cas. 1917B, 368); *Rush* v. *Aunspaugh*, 179 Ala. 542 (60 South. 802); *Timme* v. *Kopmeier*, 162 Wis. 571 (156 N. W. 961, L. R. A. 1916D, 1114); *Withers* v. *Edmonds*, 26 Tex. Civ. App. 189 (62 S. W. 795).

There is another class of cases, which holds that each stockholder has a right to rely upon the judgment and interest of his fellow-stockholders and that no shareholder has a right to separate himself irrevocably from the power of voting his own stock. One sample of such cases is *Morel* v. *Hoge*, 130 Ga. 625 (61 S. E. 487, 14 Ann. Cas. 935, 16 L. R. A. (N. S.) 1136).

On the other hand, viewing the present situation as a combination among several stockholders, which it is not, however, the rule is thus laid down in 14 C. J. 913, Section 1418:

"While there is some authority apparently opposed to this view, the weight of authority holds that stockholders may combine for the purpose of controlling the management and business of a corporation, and agree in pursuance thereof that they will vote their stock as a unit according as a majority of them may determine, provided no fraud is committed or undue advantage taken of stockholders who are not members of the combination."

See, also, 1 Thompson on Corporations, (2 ed.), §§ 893, 894 and 895. In *Winsor* v. *Commonwealth*

*Coal Co.*, 63 Wash. 62 (114 Pac. 908, 33 L. R. A. (N. S.) 63), it is said:

"Persons owning stock have the unqualified right to combine their interests to secure the management of the corporation when such management is fair to all stockholders alike."

In *White* v. *Snell*, 35 Utah, 434 (100 Pac. 927), a majority of stockholders placed their stock in the hands of other stockholders to vote, manage the corporation and generally to do all things with the shares that the owners themselves might do, for two years and five months, the trustee to pay the owners a fixed sum per month as well as all assessments and indebtedness incurred by them, and it was held not to be void as against public policy to do this. *Barnes* v. *Brown*, 80 N. Y. 527, was a case where the plaintiff was director and president of a corporation and owned a majority of the stock then issued. The corporation owed him for money loaned. Prior to his election as director and president third parties had made a construction contract with the company. After taking office he bought an interest in the contract. In this state of affairs he sold his stock and interest in the contract to the defendants, who agreed to pay him the amount owed him by the company and to deliver to him two thousand fully paid-up shares of its stock. Both parties performed, except that defendants delivered stock not legally issued and not fully paid. In an action to recover damages, it was held:

"That assuming it was part of the scheme that plaintiff should transfer the control and management of the corporation, he had the right to transfer all his stock and interest and with it the control which he had the right to exercise, as he held the majority of the stock then issued; and that in the absence of

proof of any wrongful or fraudulent intent, no policy of the law was violated by the arrangement."

In *Bonta* v. *Gridley,* 77 App. Div. 33 (78 N. Y. Supp. 961), affirmed in memorandum opinion in 185 N. Y. 614 (78 N. E. 1100), two stockholders in a bank agreed that the plaintiff should be elected cashier for five years at $2,500 a year; that he should exercise his influence in favor of the bank and the retention of the then board of directors; and that he should buy fifty shares of the bank's stock, which they agreed to repurchase from him at $135 per share on his ceasing to be cashier. The court there held:

"So far as we have been able to discover, it has not yet been held by any court that two stockholders of a corporation may not legitimately agree between themselves to use their influence jointly to secure the election of a certain board of directors of such corporation, even if one of such stockholders happens to be its cashier, provided only that the proposed agreement is entered into in good faith and for the purpose of promoting the best interests of the corporation and in fact does promote its best interests."

In *Elger* v. *Boyle,* 69 Misc. Rep. 273 (126 N. Y. Supp. 946), it was said:

"The power to vote stock incidental to its ownership may not be taken from the holder *in invitum* but he may qualify his ownership by his own consent that another may vote it for him or may accept the ownership with a condition involving that consent."

In that case a testator directed his executors to form a corporation to carry on his business, the stock to be sold according to the direction of certain named individuals, and the arrangement was held to be valid, the court saying:

"These trustees became possessed of the stock, not as their own asset but solely by virtue of the will and of the conditions which the will imposed. One con-

dition involved their consent to the restriction of their voting power and no rule of law or public policy is offended by giving effect to that contract.''

Again, in *Carnegie Trust Co.* v. *Security Life Ins. Co.*, 111 Va. 1 (68 S. E. 412, 21 Ann. Cas. 287, 31 L. R. A. (N. S.) 1186), the second paragraph of the syllabus reads thus:

''An agreement between holders of shares in a life insurance company to place their stock in the hands of trustees for a period of twenty-five years to enable the trustees more efficiently to manage the corporation, is not against public policy.''

In *Venner* v. *Chicago City Ry. Co.*, 258 Ill. 523 (101 N. E. 949), the doctrine was thus inculcated:

''It has been expressly held that a contract by the owners of more than one half of the shares of stock of a corporation to elect the directors of the corporation so as to secure the management of its property, to ballot among themselves for directors and officers if they could not agree to cast their vote as a unit as a majority should decide so as to control the election, and not to buy or sell stock except for their joint benefit, is not dishonest violation of the rights of others or in contravention of public policy. * * A majority of the stockholders may therefore by uniting in the same proxy confer upon an agent unlimited discretion to vote their stock and there is no policy of law to prevent their transferring their stock to a trustee with the like unrestricted power. It is the purpose for which the trust was created which must determine its legality.''

In *Smith* v. *San Francisco & N. P. R. R. Co.*, 115 Cal. 584 (47 Pac. 582, 56 Am. St. Rep. 119, 35 L. R. A. 309), three parties combined to buy forty-two thousand shares of the railroad company's stock belonging to the Donahue estate and to vote it in one block so as to retain control of the company for five years, the vote to be cast according to the wish of the

majority of the block ascertained by ballot. The court said:

"It is not in violation of any rule or principle of law for stockholders who own a majority of the stock in a corporation to cause its affairs to be managed in such a way as they may think best calculated to further the ends of the corporation and for this purpose to appoint one or more parties who shall vote in such a way as shall carry out their plan."

In *Bowditch* v. *Jackson Co.*, 76 N. H. 351 (82 Atl. 1014, Ann. Cas. 1913A, 366, L. R. A. 1917A, 1174), according to the syllabus we learn that:

"An agreement whereby three fourths of the stock of a corporation is transferred to trustees who are to hold the same for one year, vote it in favor of a proposed sale of the corporate property, distribute the proceeds, and take the necessary steps to wind up the company's affairs, is not open to objection, where it appears that its execution will work no wrong to the corporation and confer no special benefit upon the shareholders who are party to the compact."

Speaking of voting trusts and defining them, the definition is thus formulated in Section 1705, 3 Fletcher's Cyclopedia of Corporations:

"A voting trust may be comprehensively defined as one created by an agreement between a group of the stockholders of a corporation and the trustees, or by a group of identical agreements between individual stockholders and a common trustee, whereby it is provided that for a term of years, or for a period contingent upon a certain event, or until the agreement is terminated, control over the stock owned by such stockholders, either for certain purposes or for all, shall be lodged in the trustee, either with or without a reservation to the owners or persons designated by them of the power to direct how such control shall be used. A mere deposit of shares of stock in the hands of a depositary with directions to vote in the manner in which he is instructed by a

committee appointed by the stockholders and subject to their control, is not a voting trust, it not appearing that the ownership of the stock and the voting power were separated by the agreement under which the committee was appointed and the stock deposited.''

8, 9. In the instant case there was no voting trust within the meaning of the definition. There was no combination of stockholders. The testator was the owner in his individual right of a majority of the stock of the corporation. He had a right as an attribute of property exercised in testamentary form, to direct how and for whom the stock should be voted. No one can rightly say that if Pittock living had announced his intention steadily for twenty years to vote for certain directors who would in turn carry out certain policies as to employees, he could have been enjoined from the consummation of his purpose. How, then, can it be said that he cannot direct his trustees to do that same thing after his death, for a limited period? The will does not purport to perpetuate the limitation upon this property for more than the length of any life then in existence and twenty-one years thereafter. The period of the trust is expressly limited to twenty years. It does not constitution a perpetuity. In other words, considering the face of the will, there is no voting trust, no combination of a group of stockholders. There is only the expression of a single individual, doing as he had a right to do with his private property.

10. But it is urged upon us that this was the result of an agreement which is contrary to public policy. As we have pointed out, agreements to vote stock in a certain way are not necessarily *per se* void. In the cases cited in support of the petitioner's contention there has been always some element of private

personal gain to accrue to the contracting parties, not to be enjoined by other members of the corporation. In this instance, during his lifetime the testator could and probably did vote his stock so as to secure the election of directors to his liking. From the testimony it is plain that Mr. Pittock desired to perpetuate for a time, at least, the existing personnel of the editorial and managerial departments of his corporation, the Oregonian Publishing Company, of which he was the principal owner, and to maintain the standing of the "Oregonian," which under his direction had attained wide influence in the newspaper world. He had been assisted in this matter for some years by the trustees, who were familiar with the property and its requirements as a going concern and who, it is probable, were best qualified, at least in the judgment of the testator, to carry it on as a successful venture for some time to come. It was certainly lawful for the living owner of two thirds of the stock so to shape the directorate as to accomplish this purpose. Equally after his death, so far as he lawfully could direct by testamentary disposition of his property, it was competent to promote the same end by the same means.

11. It is urged, however, that the effect of his will was to compel the trustees not only to vote for themselves as directors but to retain both Morden as manager and Piper as editor, with the result that the trustees, taking office as directors, would be compelled without regard to the real interests of the corporation to carry out the policy indicated by the will, whether it be for the benefit of the corporation or not; in other words, that their duty as trustees would thus be brought in conflict with their obligations as directors, to the detriment of the latter re-

lation.   This argument is predicated upon the theory
that the words "desire" and "request" used in the
"Oregonian" clause with respect to Morden and Piper
are necessarily mandatory.   The significance of such
words as "desire" and "request" was considered in
*Beakley* v. *Knutson*, 90 Or. 574 (174 Pac. 1149, 177
Pac. 955).   We there laid down the rule in substance
that in construing words such as "desire" and "re-
quest" when used in a will, the testator's intention
is controlling, and where the words must necessarily
be followed to carry out the clear purpose of the
testator they are to be regarded as words of com-
mand   or   direction.   The   conclusion   there   was
strengthened by the fact that the will disposing of
the property involved used this language as express-
ing the testator's desire and request to his executrix:

"I direct and request that she use such or all of
the money which may be the proceeds of any prop-
erty she may sell."

The term "desire" was held to be imperative in
its purport, and construing the whole will together,
having in view the plain intent of the testator, it was
determined that in the light of all these circum-
stances and accompanying words the request and de-
sire expressed by the will were controlling.   The
doctrine is thus stated in 2 Alexander on Wills, Sec-
tion 1096:

"A trust may or may not be created according to
whether or not the precatory expressions are directed
to the executor or to the beneficiary.   Expressions of
desire, recommendation, hope, or the like, addressed
to the beneficiary, may be regarded as being merely
words of request and not of command, while if ad-
dressed to the executor of the testator's will, the
testator having the right to command the manner of
the disposition of his property, such expressions will
be considered and construed as commands, although

clothed merely in the language of civility, and the courts will enforce them as a duty imposed upon the executor.''

We note in passing that the desire and request in the present instance are addressed not to the executor as such, but to the trustees, successors of that executor. Trustees as a rule have more discretion than the immediate mandatory of the testator. The duties of an executor are plainly defined by the terms of the will as measured by the provisions of the statute. The trustees are in a sense beneficiaries, rather than occupying the character of executors. The language of the will as to the trustees will bear a more liberal construction than if addressed directly to the executor as such. We find the rule thus laid down by Mr. Justice Sommes in *Lines* v. *Darden,* 5 Fla. 51, 73:

"The words 'will and desire' are not necessarily mandatory, nor does the question turn upon their grammatical construction. Their import and signification depend, not so much as to whom they are addressed as to the party using them, the act to be performed and the certainty of the subject matter."

Again, in *Coulson* v. *Alpaugh,* 163 Ill. 298, 302 (45 N. E. 216), the principle is thus expressed:

"The words 'request' and 'requesting' are, under many circumstances, precatory words sufficient to raise a trust, and under other circumstances it is otherwise. It depends not only upon the sense in which the words are used—whether intended as imperative, or as merely the expression of a wish or preference, the observance of which is left to the discretion of the first taker—but even where it is clear the language is intended as mandatory, it also depends upon the fact whether the intention is defeated by the other provisions of the will, for it is just as essential to the creation of a trust there should be certainty of object and certainty of subject matter as

it is that the words in which the intention is expressed should be imperative.''

In *Williams* v. *Worthington*, 49 Md. 572 (33 Am. Rep. 286), the syllabus in part declares that:

''Words of recommendation and other words precatory in their nature are not to be construed as peremptory unless by the context of the will that meaning is forced upon them.''

It is taught in *Floyd* v. *Smith*, 59 Fla. 485 (51 South. 537, 138 Am. St. Rep. 133, 21 Ann. Cas. 318, 37 L. R. A. (N. S.) 651), that:

''The real question is: What was the intention of the testator? Did he intend that the words expressing the wish, desire, recommendation or confidence or the like should govern the conduct of the party to whom they may be addressed, or whether they are an indication of what he thinks would be a reasonable exercise of the discretion of the party, leaving it, however, to the party to exercise his own discretion. It does not seem to have been found possible to formulate any definite statement of principle which will apply to every case.''

And in a note to this case in 21 Ann. Cas., *supra,* we read this:

''The cardinal rule used in the interpretation of wills that the intention of the testator shall govern applies to the creation of precatory trusts and no hard-and-fast meaning can be given to words apart from their connection and the atmosphere of the instrument in which they are used.''

It is said in *Estate of Pforr*, 144 Cal. 121 (77 Pac. 825), that ''desire'' is a request when addressed to the devisee, but a command when addressed to the executor. To the same effect is *Post* v. *Moore*, 181 N. Y. 15 (73 N. E. 482, 106 Am. St. Rep. 495, 2 Ann. Cas. 591).

Reverting to the "Oregonian" clause, we find that the will "directs" the trustees to vote the stock in favor of themselves as directors of said corporation. Immediately the tone of the language changes, "and it is my desire and I request," etc. If the testator, familiar as he was from his experience as a newspaperman with the use of words and their shades of meaning, had desired to make the employment of Morden and Piper imperative, he most likely would have grouped all those matters under the mandatory word "direct." In the immediately preceding clause of the will he had declared that "the trustees shall have full and complete power and authority over my estate; they shall have full and complete possession and control of same." Finally in that clause, speaking directly about shares of stock, he employed this language: "They shall have power to vote my stock in the various corporations at all meetings of the stockholders of such corporations and shall have all powers incident to the ownership of such stock. In view of this strong and comprehensive language, the change of his expression immediately from "direct" to "desire" and "request" is very significant and we think it is legitimate to construe the latter clause as merely precatory and advisory, but not mandatory.

More than all that, it is not shown or intimated that the agreement, if there was one, to employ Morden and Piper would be harmful to the best interests of the corporation or hurtful to the interests of the other stockholders, or that it was based upon any benefit private or personal to Pittock. Their long retention in the service of the corporation attests their ability and faithfulness, and in the light of the best authorities it was legitimate for the con-

trolling stockholder so to shape the direction of his property and his testamentary instructions to his trustees as to express his best judgment and give it effect in corporate operation through the regular channel of a board of directors elected by that stock.

12. Again, it is said in the attack upon the will that the trust created is void for uncertainty. Some of the precedents supporting that contention are here noted: *McMonagle* v. *McGlinn*, 85 Fed. 88. In determining whether to apply the statute of limitations to plaintiff's suit to declare a trust and to subject thereto certain property dependent upon whether the bill showed an express trust to which the statute would not apply, or a constructive trust to which it would apply, the court, quoting from 2 Pom. Eq. Jur., Sections 1000–1010, said an express trust must be reasonably certain as to terms, property, beneficiaries, their interests and the manner of performance of the trust. In that case the plaintiff claimed that her brother had collected part of an estate coming to her, had paid her part of the proceeds and retained the rest. The exact amount of the property retained was not certain. There was no showing as to what use it was agreed he should make of the property, how long he should keep it, or what disposition he should make of it. Hence there could be no express trust; but that was the substance of her declaration and the court held that the plaintiff's complaint did not show an express trust. In *Greenwood* v. *Greenwood*, 97 Kan. 380 (155 Pac. 307), Mrs. Greenwood obtained a decree of divorce from her husband in which it was "ordered, adjudged and decreed that the said plaintiff shall have and there is hereby set apart to her as her separate estate and as and for her alimony in said action the following

described real estate [describing it], to be held by said Anna Greenwood in trust for Grace and Helen Greenwood until the said Helen Greenwood shall attain her majority, and at the expiration of said time or upon the death of both of said children before said time, the title to said property shall vest in the said Anna Greenwood absolutely and in fee." Mrs. Greenwood had contracted to sell this property to her former husband, who sued for specific performance, and she resisted on the ground that the realty was held in trust. Concerning her estate, the court held that it was not affected by the words "in trust" and that owing to the utter absence of terms of the trust or of its administration, she took a fee. In *Orr v. Yates,* 209 Ill. 222 (70 N. E. 731), William H. Yates devised a farm to a trustee for the sole use and benefit of his daughter during her life and at her death without issue, for the benefit of the widow if living, and at the widow's death, the land was to be divided between the testator's brothers and sisters and their heirs. No provision was made for accounting or manner of conducting the farm. The court said:

"It may be conceded that the declaration of a trust must be reasonably certain in its material terms, and that this requisite of certainty includes, first, the subject matter or property embraced within the trust; second, the beneficiaries or persons in whose behalf the trust is created; third, the nature and quantity of interests which they are to have; and fourth, the manner in which the trust is to be performed. If the language is so vague, general or equivocal that any one of these necessary elements of the trust is left in real uncertainty, the trust must fail; or if any one of the three things necessary to constitute a trust is wanting,—that is, first, sufficient words to raise it; second, a definite subject; and third, a certain or

ascertained object,—the trust will fail. It is not practicable to adopt any specific definition of, a trust which can be applied to all cases. Many attempted definitions are to be found in the text-books and decided cases, but it is unimportant here to accept one rather than another. All must agree that it is not necessary to the validity of a trust that every element necessary to constitute it must be so clearly expressed in detail in the instrument creating it that nothing can be left to inference or implication. No particular form or words are necessary, but wherever an intention to create a trust can be fairly collected from the language of the instrument and the terms employed, such intention will be supported by the courts. * * The fact that the times and manner of accounting for the rents and profits of the trust estate are not fixed cannot render the trust void. The law will compel the trustee to render accounts in proper manner and at proper times. The absence of specific directions as to when and in what manner the trustee shall render his accounts, simply leaves that matter to be determined by construction. If the trustee and *cestui que trust* disagree on that subject, the courts may be resorted to for a settlement of the differences.''

In *Colton* v. *Colton,* 127 U. S. 300 (32 L. Ed. 138, 8 Sup. Ct. Rep. 1164, see, also, Rose's U. S. Notes), the will reads thus:

''I give and bequeath to my wife, Ellen L. Colton, all of the estate real and personal of which I shall die seized or possessed or entitled to. I recommend to her the care and protection of my mother and sister and request her to make such gift and provision for them as in her judgment will be best.''

Notwithstanding this indefinite language, which hardly could be more uncertain, the court held that the widow took the property affected by a trust for the benefit of the decedent's mother and sister.

102 Or.—13

"But giving a trust in discretion as to the method of carrying out a definite purpose does not render the trust void and if the trustee refuses altogether to exercise that discretion with which he is invested, the trust must not on that account be defeated": 26 R. C. L. 1184.

*Weatherhead* v. *Sewell*, 28 Tenn. (9 Humph.) 272, was a case where the language of the will was, "my estate to be equally divided among my children, to each of my daughters a small tract of land, * * my lands and slaves to be equally divided amongst my children." It was held in construing the will that the clause "to each of my daughters a small tract of land," was void for uncertainty; but the court did not set aside the whole will for the minor uncertainty. Other authorities are cited in the brief of the petitioner, but in the main they are precedents which deal only with a certain clause of the will but do not allow it to overturn the entire instrument.

The trust created by this will, however, is reasonably certain for all practical purposes for the management of a business during so long a period, as twenty years. It declares that it is made "to avoid as far as possible any loss or depreciation of the estate." Here we have the principal object for which the trust was formed. As a means and manner by which this result is to be attained with a view of final distribution of the property among his descendants, the testator has given to his trustees full and complete power and authority over his estate, with the right to full and complete possession and control of the same, and they are directed to keep surplus funds invested in good securities. As part of it, they are to pay monthly allowances to his wife and children and to their descendants by right of representation. The trustees are directed to accumulate

enough to pay off the debts and obligations and when that is accomplished they shall disburse the excess of such reserve to his wife and children; and finally upon the termination of the trust, at the end of twenty years, they shall divide the property among his descendants. It would be impossible for a testator to foresee and provide for all of the details to be observed in the management of a trust estate of such magnitude. It is sufficient if it be done so that anyone of reasonable discretion and judgment could take the property and manage it in a reasonably faithful manner. The action of the testator in thus reposing so large a trust in two employees who had been faithful to him through many years may or may not have been provident, as the sequel shall prove, but it was not unlawful, and the will in that respect is a valid document, declaratory of his disposition of his estate.

Summing up, we hold that there was no error in striking out of the original petition the conclusions of law stated as grounds for the contention that the will was void. The petitioner has had the benefit of a full argument and examination of the questions so raised. The Circuit Court before which this proceeding was instituted had ample jurisdiction of the suit, whether it be one merely to set aside the will as void for undue influence, or whether the issue was the construction of the will with a view of having it declared void. In the absence of an allegation of an illegal contract void as against public policy the will cannot be attacked upon that ground. Further, no agreement of stockholders proceeding from any private mercenary consideration of benefit to themselves in which other members of the corporation could not share has been shown. The testator in disposing of his own property had a right to direct his

trustees to vote and act as he himself could have done while living. Even conceding that there was a contract, there is nothing to show that it was hostile to the interest of any stockholder or disqualifying in its effect upon the trustees who have succeeded to the interests of the testator. Finally, the trust established by the will is sufficiently certain in all of its features for practical operation.

To close this opinion, we employ the final words of the court's deliverance in *Carnegie Trust Co.* v. *Security Life Ins. Co.,* 111 Va. 1 (68 S. E. 412, 21 Ann. Cas. 1287, 31 L. R. A. (N. S.) 1186):

"As was said in *Brightman* v. *Bates,* 176 Mass. 105 (55 N. E. 809), the question before us is not whether or not it would be possible to carry out the contract in a way which would have made the contract bad if specified in it, but whether it was impossible to carry out the contract in a way which might lawfully have been specified in advance. If in the future, the trustees are guilty of a breach of trust, or do any unlawful act to the prejudice of the interests of the corporation or its stockholders [in this instance the *cestui que trustent*], a court of equity is always open to give such relief as the nature of the case may require."

The decree of the Circuit Court is affirmed.

Affirmed.

---

Allowed November 22, 1921.

On Motion to Retax Costs.

(202 Pac. 216.)

On motion to retax costs.

Allowed.

In Banc.

BURNETT, C. J.—The decree of the Circuit Court establishing the will of Henry L. Pittock, deceased,

against the attack of the contestant, Caroline P. Leadbetter, was affirmed in an opinion of this court handed down July 26, 1921. The mandate has not yet been issued to the Circuit Court.

On September 8, 1921, the executors of the will filed their cost bill and statement of disbursements, containing the following items: Filing fee, $10, attorneys' fee, $10, and cost of printing respondents' brief, $314.20; total, $334.20. Service of this bill was made on the contestant on September 7, 1921, as appears by the acceptance attached thereto, conditioned that it was "without waiver of the rights of appellant to object that the same has not been served or filed within the time provided by law." On September 10th the contestant filed her opposition to the cost bill mentioned and to each of the items contained therein and as grounds therefor objected "against any order by this court or the clerk thereof to tax any costs in the above-entitled cause against said contestant and appellant for the reason that the respondents have not served or filed any cost bill herein within the time required by law and the rules of the supreme court." The clerk allowed statutory costs in the sum of $25, rejecting the item charged for printing the brief.

In a paper styled "Motion to Retax Costs," the respondents "ask that the cost bill in this case be retaxed and that the disbursement of the respondents, $314.20, for cost of printing respondents' brief, be allowed as an item of costs and disbursements herein."

As to the right to allow costs and disbursements at all, the principle is thus laid down in 15 C. J. 21:

"At common law costs were not recoverable *eo nomine*. If plaintiff failed, he was punished by

amercement for false clamor, and defendant, where the judgment was against him, *in misericordia cum expensae litis*. Costs can therefore be imposed and recovered only in cases where there is statutory authority therefor, and where the party claiming costs comes within the operation of the statutory provision relating to costs. The courts have no power to adjudge costs as against anyone on mere equitable or moral grounds.

"While the power to impose costs must ultimately be found in some statute, the legislature may nevertheless grant the power in general terms to the courts, which in turn may make rules or orders under which costs may be taxed and imposed; but the courts cannot make such rules or orders and impose costs thereunder, unless the power so to do is expressly given them by statute, or ratified by legislative enactment."

The text is supported by a great wealth of authority in precedents too numerous to be cited here, except two from our own state. As said by this court in *Wood* v. *Fitzgerald*, 3 Or. 568, 583:

"All the authorities concur in declaring the right to recover costs to be purely statutory. No such right existed at common law. The authority to tax costs and disbursements *eo nomine* in favor of the prevailing party in the English courts, is found in the statute of Gloucester, 6 Edward I, c. 1, and in the statutes, 23 Henry VIII, c. 15; 4 James I, c. 3; 8 & 9 William III, c. 11; and 4 and 5 Anne, c. 16; and the various amendments thereto. In this state, the right to recover costs is given by the Code; the provisions in relation thereto being in principle and effect similar to the English statutes named. * *

"From the application of the rules of construction just referred to, it follows, that unless a party is allowed costs he cannot recover disbursements. For the recovery of disbursements is made dependent upon the recovery of costs by the statute."

The principle is thus stated in *State ex rel.* v. *Estes,* 34 Or. 196, 213 (55 Pac. 25):

The "expenses incident to the trial of an action not being recoverable at common law, the right to recover them must be found in the statute."

The original statute on costs and disbursements is found in Title V, Chapter VI of the Civil Code adopted by the legislative assembly in 1862 and which went into effect June 1, 1863. Digressing briefly, it is proper to differentiate between "costs" and "disbursements." Costs are certain sums to be allowed to the prevailing party in the judgment or decree, by way of indemnity for his attorney's fee in maintaining the action or suit or defense thereto: Or. L., § 561. Disbursements, on the other hand, are the necessary expenses connected with the prosecution or defense of the litigation: Or. L., § 566. Costs are fixed by Section 565, Or. L. It may be remarked that to a large extent, both in the opinions of this court and in briefs and other documents emanating from the bar, the distinction between "costs" and "disbursements" has not always been observed, but the fact is, that the two are entirely distinct, costs being fixed in amount as a conclusion of law, while disbursements vary according to the actual expenditures in the litigation and mainly involve questions of fact. The schedule provided for costs in Section 565, Or. L., is as follows, among other things: "1. In the Supreme Court, on an appeal, to the prevailing party, $15." As it affects the question before us, the original Code on this subject has remained intact without amendment to the present time, except as to Sections 546 and 547 of that compilation, which were amended by the act of February 24, 1903. In their changed form these sections read as follows:

"Costs and disbursements shall be taxed and allowed by the court or judge thereof in which the action, suit, or proceeding is pending. No disbursements shall be allowed to any party, unless he shall serve on such adverse party or parties as are entitled to notice by law, or rule of the court, and file with the clerk of such court within five days after the rendition of the judgment or decree, a statement, with proof of service thereof, if notice to the adverse party is required, indorsed thereon or attached, showing, with reasonable certainty, the items of all disbursements, including fees of officers and the number of miles of travel and number of days' attendance claimed for each witness, if any, which statement must be verified, except as to fees of officers. Such statement of disbursements may be filed with the clerk at any time after said five days, but not later than the first day of the next regular term of the court occurring after the expiration of said five days; but in such case, such statement must be served on the adverse party or parties whether he or they shall have appeared or not. A disbursement which a party is entitled to recover must be taxed whether the same has been paid or not by such party. The statement of disbursements thus filed and costs shall be entered as of course by the clerk as a part of the judgment or decree in favor of the party entitled to costs and disbursements, unless the adverse party within five days from the expiration of the time allowed to file such statement shall file his objections thereon, stating the particulars of such objections, which objections must also be verified. Questions of law and of fact, denials of any or of all of the items charged in the statement, and allegations of new matter, may be joined and included in the objections, and each and all of these shall be deemed controverted and denied by the party filing the statement without filing any further pleading. The statement of disbursements, and the objections thereto, constitute the only pleadings required on the question of taxation and allowance of costs and disbursements, and they shall

be subject to the right of amendment like pleadings in other cases'': Section 569, Or. L.

"As soon as convenient after objections are filed against a statement of disbursements, the court, or judge thereof, in which the action, suit or proceeding is pending, shall, without a jury, proceed to hear and determine all the issues involved by the statement and objections as to costs and disbursements. At such hearing the court or judge may examine any record or paper on file in the cause, and either party may produce relevant or competent testimony, either orally or by deposition, or otherwise, to sustain the issues on his behalf. Either party may except to the ruling of the court or judge upon any question of law made at such hearing, and the same shall be embodied in a bill of exceptions, as in other cases. As soon as convenient after the hearing, the court or judge thereof shall make and file with the clerk of the court a correct itemized statement of the costs and disbursements as allowed by the court or judge, and shall render judgment thereon accordingly for the party in whose favor the same are allowed; and no other finding or conclusion of law or fact shall be necessary, and the same shall be final and conclusive as to all questions of fact. The issues arising on the statement of disbursements, and the objections thereto, shall be heard and determined by the court or judge without either party recovering further costs or disbursements from the other, except that in the discretion of the court, or judge thereof, a sum not exceeding $5 as costs, but without further disbursements, may be allowed to the party prevailing on the issues arising on the statement and objections thereto. An appeal may be taken from the decision and judgment of the court, or judge thereof, on the allowance and taxation of costs and disbursements on questions of law only as in other cases, and on such appeal the statement of disbursements, the objections thereto, the statement of costs and disbursements as filed by the court or judge, the judgment or decree rendered

thereon, and the bill of exceptions, if any, shall constitute the judgment-roll"; Section 570, Or. L.

The original act, as well as the present statute, contemplates that there should be costs allowed in the Supreme Court, for the amount thereof is fixed. The practice in the Supreme Court as to costs at least is consequently governed by the statute. The law also declares in Section 566, Or. L., that:

"A party entitled to costs shall also be allowed for all necessary disbursements, including the fees of officers and witnesses, the necesary expenses of taking depositions by commission or otherwise, the expense of publication of the summons or notices, and the postage where the same are served by mail, the compensation of referees, and the necessary expense of copying any public record, book or document used as evidence on the trial."

It is also provided in the act of February 28, 1921, Chapter 322, Laws 1921:

"When costs are allowed to the prevailing party on appeal to the Supreme Court, the appearance fees, trial fees, attorney fees, as provided by law, the necessary expenses of transcript or abstract, as the law or rules require; the printing required by rule of the court, and the transcript of testimony or other proceedings, when necessarily forming part of the record on appeal, shall be taxed in the Supreme Court as costs of the appeal."

Without these statutes, no costs or disbursements could be recovered in this court, or for that matter in any other court. There is no other statute directly or indirectly conferring upon this court the right to impose financial exactions upon any litigant, in the shape of costs or disbursements. In paraphrasing the maritime rule that "freight is the mother of wages," we might say that costs are the *sine qua non*

for disbursements, as taught in *Wood* v. *Fitzgerald, supra.*

It is urged that Rules 29 and 30 of this court control the matter in hand. They read thus:

"Rule 29. It shall be the duty of the clerk in taxing costs to allow the prevailing party the actual costs of printing his abstract or brief (for not exceeding forty copies). But he shall not allow exceeding $1.25 a page, including cover, unless for special reasons apparent in the record it shall be otherwise ordered.

"Rule 30. Costs and disbursements in this court will be taxed by the clerk, and his allowance or rejection, and all objections thereto, shall stand as the determination by the court, unless the party affected thereby shall within ten days after such taxation move to retax the same."

As to the comparative authority of the statute and rule of court, the principle is thus stated by Mr. Justice HARRIS in *Schnitzler* v. *Stein,* 96 Or. 343, 347 (189 Pac. 984):

"When courts exercise the power of making rules, whether such power is conferred by statute or is deemed to exist in the absence of statute, they cannot by a mere rule of court regulate a matter which is already regulated by statute": Citing 15 C. J. 904.

As applied to the present juncture in *Rader* v. *Barr,* 37 Or. 453 (61 Pac. 1027), it is said in the syllabus that:

"The provision of Section 556, Hill's Ann. Laws, requiring service of cost bills when filed more than five days after the entry of the judgment or decree, regulates the practice in the Supreme Court as well as in the Circuit Courts."

Thus the court in that case recognized the application of the chapter on costs and disbursements to proceedings in the Supreme Court.

Again, in *Hammer* v. *Downing,* 39 Or. 504, 527 (67 Pac. 30), the court, speaking by Mr. Justice MOORE, declared that:

"The statute prescribing the time and manner of filing a verified statement of the costs and disbursements necessarily incurred in the trial of a suit or action in the lower court is to be regarded as the rule of procedure in this court."

These two cases of *Rader* v. *Barr* and *Hammer* v. *Downing* were decided before the amendment of February 24, 1903, but that act did not change the reason of the rule. It merely transferred from the clerk to the court the power in the first instance to tax costs and disbursements and provided a system of pleading whereby these ancillary issues might be litigated. In *McFarlane* v. *McFarlane,* 43 Or. 477, 487 (75 Pac. 139), the court, again speaking by Mr. Justice MOORE, said:

"Though this statute was evidently designed to regulate the mode to be pursued in taxing costs and disbursements in the Circuit Courts, the rule prescribed ought to be adopted as far as applicable in this court": Citing *Rader* v. *Barr.*

There is nothing in the amendment of February 24, 1903, restricting its operation to the Circuit Court. Like the sections of which it is amendatory, it applies to both Circuit and Supreme Courts. The original title of which the new enactment is a part allows costs in the Supreme Court and these draw after them disbursements as an inevitable consequence. In terms applicable to both Supreme and Circuit Courts, the legislature has established a procedure governing their taxation and allowance. There is no reason or authority for including the Circuit Court

within and excluding the Supreme Court from the purview of this legislation.

Originally the costs and disbursements were to be taxed and allowed by the clerk: Deady's Code, § 546. The procedure there was to file objections to the claim for costs and disbursements, and the clerk passed upon them in the first instance. The party aggrieved by the decision of the clerk applied to the court and the practice was that the court had to make findings of fact and conclusions of law as to each item challenged. This imposed a great amount of clerical labor upon the court, and hence the legislative assembly adopted the simplified form now embodied in Sections 569 and 570, Or. L., with the result that the clerical labors of the court or judge in taxing costs and disbursements are confined to making a correct cost bill. In *Anderson* v. *Adams*, 44 Or. 529 (76 Pac. 16), the applicability of the statute to proceedings in this court, as to disbursements, was again recognized in an opinion by Mr. Justice WOLVERTON, where the cost bill was filed on December 28, 1903, but never served, although the judgment of affirmance was rendered November 16th of that year. The court refused to allow any disbursements but allowed the costs at $15, and the filing fee of $10 as of course, those being the statutory amounts prescribed. In *Egan* v. *North American Loan Co.*, 43 Or. 131, 140 (77 Pac. 392), a *per curiam* opinion construing the 1903 amendment, refused to strike out a cost bill filed but not served during the five days succeeding the rendition of the decree, saying that:

"There is no law, so far as we are advised, or rule of this court, entitling any adverse party to notice of a proceeding of this nature."

This excerpt evidently referred to the following language of Section 569:

"No disbursements shall be allowed to any party, unless he shall serve on such adverse party or parties as are entitled to notice by law, or rule of the court, and file with the clerk of such court within five days after the rendition of the judgment or decree, a statement, with proof of service thereof, if notice to the adverse party is required, indorsed thereon or attached. * * ."

The statute makes the requirement of notice to depend not only upon the law but also upon a rule of court.   Section 542, Or. L., has this language:

"When the defendant has not appeared, notice of a motion or other proceeding need not be served upon him, unless he be imprisoned for want of bail, or unless directed by the court or judge thereof in pursuance of this Code."

This furnishes color, at least, to the language of Section 569 respecting "such parties as are entitled to notice by law."   It is competent also for any court of record to promulgate rules requiring notice of the filing of any paper to be served on the adverse party in any litigation before such court.   In the Egan case it did not appear that there was any party entitled to notice under Section 542, and as there was no rule of court to require notice, the case was properly decided; and, as to a cost bill filed within five days after rendition of judgment, there was no requirement under the statute respecting its service.   These cases indicate that the court recognized the authority of the statute over the subject of costs and disbursements in this court, expressly saying so in *Rader* v. *Barr* and *Hammer* v. *Downing, supra.*

The first indication of departure from this rule is found in *Heywood* v. *Doernbecher Mfg. Co.*, 48 Or. 359, 368 (87 Pac. 530), decided November 21, 1906. In that case the clerk of the Supreme Court made findings of fact and conclusions of law on objections to a cost bill. On a motion to retax costs, after quoting the amendment of 1903, Mr. Justice MOORE, writing the opinion, said:

"A perusal of the amendment referred to will show that its provisions are applicable only to the trial court. It may also well be doubted if the original statute was ever intended to regulate the manner of taxing costs and disbursements incurred on appeal. This court, however, has generally followed the statute thus prescribed and the practice in this respect has acquired the binding force of a tacit rule. As the consideration of causes on appeal demands the time of the court, the taxation of contested claims for items of costs and disbursements has heretofore been submitted to the clerk as a referee for his determination in the first instance, subject to review upon motion by a party aggrieved by his allowance or rejection. As this practice facilitates the dispatch of business and as the statute now in force does not apply to this court, we shall adhere to such procedure though no formal rule to that effect has been adopted."

Doubtless it is competent for the court to refer to the clerk as a referee issues arising on the pleadings about costs and disbursements: Or. L., § 161. No reference, however, would be proper until some issue framed by the parties should arise. Much less can the clerk assume to attack any item of a bill without any issue joined thereon. The matter involved in the Heywood-Doernbecher case was a charge for transcribing testimony for use in argument before

the Circuit Court, which was properly held to be taxable in the first instance, only in that court.

Following this, came *Sommer* v. *Compton,* 53 Or. 341 (100 Pac. 289), also written by Mr. Chief Justice Moore. The defendant succeeded in reversing the judgment of the Circuit Court and filed here a bill for costs and disbursements, which he had served on the plaintiff. No objection was made to the bill, but the clerk on his own motion disallowed the charge for "cost of transcript of testimony, $59." The court entertained a motion to retax costs *eo nomine* and went so far as to say:

"We conclude that when a bill for costs has been filed in this court, containing items for which charges are made in excess of the sums established by law, it is the duty of our clerk to disallow the excess, though no objections have been filed. Where, however, a cost bill has been served and filed, containing items of disbursement, for the recovery of which the statute or rules of this court prescribe maximum sums, and no written objections are interposed, our clerk is not permitted to disallow any part of the items charged, if it appears that all the charges are within the rate specified."

Again, in *Boothe* v. *Farmers & Traders' National Bank,* 53 Or. 576, 588 (101 Pac. 360), on objection to a cost bill the clerk disallowed part of a charge "for making transcript on appeal, $192.50." The court entertained a motion to retax costs and modified the clerk's decision by allowing $163.80 of the charge. Referring to items rejected by the court, it is said in the opinion by Mr. Chief Justice Moore:

"These charges being illegal, no formal objection was necessary to secure the exclusion thereof."

In *McGee* v. *Beckley,* 54 Or. 250, 254 (103 Pac. 61), and *De Vall* v. *De Vall,* 57 Or. 128, 145 (110 Pac. 705), certain items of the cost bill of the prevailing party had been disallowed by the clerk, whether on objection or not does not appear in the report. But again speaking by Mr. Chief Justice MOORE, a motion to retax costs was denied by this court. In *Allen* v. *Standard Box Co.,* 53 Or. 10, 18 (98 Pac. 509), the defendant prevailed in the Supreme Court, filed its bill of costs and disbursements, including an item of $71.10 for "transcribing testimony to incorporate in bill of exceptions." The clerk disallowed that item and on motion of the defendant to have the item taxed as a proper disbursement, the action of the clerk was approved on the ground that the charge was an expense in the trial court, to be adjusted there. In *Delovage* v. *Old Oregon Creamery Co.,* 76 Or. 430, 439 (147 Pac. 392, 149 Pac. 317), in an opinion by Mr. Justice HARRIS, concurred in by Justices MOORE, BEAN and BURNETT, a motion to retax costs was denied. In that case it does not appear whether the clerk had made any ruling or not, and this feature also occurs in *Henderson* v. *Tillamook Hotel Co.,* 76 Or. 379, 391 (148 Pac. 57, 149 Pac. 473), where Mr. Justice HARRIS considered a motion to retax costs on the objection of the opposing party. In *Gross* v. *Gage,* 77 Or. 421, 424 (149 Pac. 939, 151 Pac. 655), objections to the cost bill were sustained by the clerk and a motion to retax was denied in an opinion by Mr. Justice HARRIS, in which Justices MOORE and McBRIDE and the writer of this opinion concurred. See also, *Zeuske* v. *Zeuske,* 55 Or. 85, 87 (103 Pac. 648, 105 Pac. 249, Ann. Cas. 1912A, 557), in which Mr. Justice EAKIN wrote the opinion. The

principal case there was decided August 17, 1909, the petition for rehearing was denied October 26th and the mandate issued November 4, 1909. The cost bill was tendered November 11th and filing refused. It will be observed that the case was decided during the March term of this court, viz., August 17th. Under the authority of *Hammer* v. *Downing, supra,* the judgment of the Supreme Court became final when the opinion was handed down. The cost bill in the Zeuske case was not filed within five days after the rendition of the decree nor by the first day of the October term following, and hence under the statute was properly rejected. But the opinion of Mr. Justice Eakin, in addition to that, proceeded upon the theory that the statute does not apply to the Supreme Court, and declined to recall the mandate for the purpose of retaxing costs, relying upon Rules 27 and 28 as reported in 50 Or. 582, 584.

The litigation about costs and disbursements has been consistently recognized by this court as ancillary to the principal cause of dispute, in which separate pleadings, separate decisions and separate appeals may be had where an appeal is allowable: *Lemmons* v. *Huber,* 45 Or. 282 (77 Pac. 836); *School District* v. *Alameda Construction Co.,* 87 Or. 132, 144 (169 Pac. 507, 788).

13. Bearing in mind that costs in the Supreme Court on an appeal are fixed in favor of the prevailing party at $15, we advert to Section 566, Or. L., where it is declared that:

"A party entitled to costs shall also be allowed all necessary disbursements."

There is nothing in the language of the statute anywhere eliminating the Supreme Court from the sanc-

tion of the whole chapter on costs and disbursements. Indeed, unless we can put our finger upon a statute for authority, no costs or disbursements can be allowed in any court. The statute was originally treated as being applicable to this court. Nothing has ever been enacted to the contrary. It is said in Section 569, Or. L., in plain language:

"Costs and disbursements shall be taxed and allowed by the court or judge thereof in which the action, suit or proceeding is pending."

14. We have no right to abjure the jurisdiction thus cast upon us by the Code. Rule 30, saying, "costs and disbursements will be taxed by the clerk," is in direct contradiction of the statute. Under all the authorities it must yield to the statute. It is judicial heresy for us to say by rule that costs and disbursements shall be taxed by the clerk, when the statute declares that they shall be taxed by the court or judge thereof. Again, Section 569, Or. L., says:

"The statement of disbursements thus filed, and costs shall be entered as of course by the clerk as a part of the judgment or decree in favor of the party entitled to costs and disbursements," unless objections are filed.

The authority thus conferred upon the clerk is ministerial. He is in no sense a judicial officer. The statute is the measure and limit of his authority, which is only to allow disbursements "as of course" when there is no objection.

It is expressly stated at the close of this section that:

"The statement of disbursements, and the objections thereto, constitute the only pleadings required on the question of taxation and allowance of costs

and disbursements, and they shall be subject to the right of amendment like pleadings in other cases.''

15. As to the filing of the statement of disbursements, it is required in the first instance that they be filed within five days after the rendition of the judgment, accompanied by notice, if notice is required either by statute or by rule of court. The time for such filing is also set forth by the succeeding provision of the enactment, to the effect that it may be filed as late as the first day of the next regular term of the court occurring after the expiration of the said five days. In this instance, the cost bill was filed September 8th. The decision was rendered in the March term. Served as this cost bill was, the filing could have been delayed as late as the first day of the October term. The only objection to it is, that it was not served or filed within the time required by law and the rules of the Supreme Court. No other issue is tendered in this supplemental litigation. The law having spoken on the subject, that any time not later than the first day of the next regular term is proper for filing a cost bill which has been served, it is beyond the power of this court to shorten that time by rule. The cost bill was clearly filed in time. No objection other than the time of filing being interposed, neither the clerk nor the court has authority under the statute to go outside of the issues thus framed by the parties themselves and assume to raise new issues and objections as to disbursements the amount of which is not fixed by law. Automatically by force of the statute fixing its amount, the disbursement for filing fee follows costs beyond the power of court or clerk to increase or diminish, so that it would be a violation of the legislative mandate to

allow any greater sum than the legal charge on that score. Both the parties have a right to be heard on the issues which they themselves have joined.

The printing of the brief is an expense allowed not only by statute but also by the rules of court in consonance therewith. If no objection is made to it, it must be allowed as a matter of course under the terms of Section 569. Any contest respecting the same must be decided by the court, according to the requirement of Section 570, Or. L. Under this statute, neither the court nor much less the clerk has arbitrary power to disallow any item of disbursements against which no objection has been filed except as above stated respecting filing fees. Like any other case, there are pleadings, in the shape of a cost bill and objections, upon which questions of law and of fact arise. The decision of these questions of law belongs rightly to judicial officers, and in this instance the decision of questions of fact is also committed to the same judicial officers. We cannot abjure this jurisdiction, nor confer upon the clerk, a ministerial officer, arbitrary power to reject any claim on his own motion, the statute having given him only the authority to allow items as of course in certain instances. On the record as presented, no objection having been interposed as a pleading, except that the cost bill was not filed in time, the claim of the plaintiffs for costs and disbursements must be allowed as stated. No other legal conclusion can be drawn from the pleadings in this ancillary litigation.

The result is, that *Heywood* v. *Doernbecher Mfg. Co.*, 48 Or. 359 (87 Pac. 530), *Sommer* v. *Compton*, 53 Or. 351 (100 Pac. 289), and other cases, so far as they hold that the statute embodied in Chapter VI of Title VII of Oregon Laws and the act of February

24, 1903, do not apply to proceedings in the Supreme Court and that the clerk has power to disallow any item of costs or disbursements of a bill properly served and filed without any objection being urged against it, must be considered as overruled.

MOTION TO RETAX COSTS ALLOWED.