# Mann v. Flanagan.

### Partnership—Compensation for Services.

The general rule is, that one partner is not entitled, as against the other partners or the firm, to any compensation or commission for his skill or services employed in the partnership business, unless there is an express agreement to that effect; but this rule, though of general, is not of universal, application; as, where such agreement may be implied from the course of dealing between the partners, or other circumstances of equivalent force.

Whether a partner is entitled to commissions for services rendered the firm, depends upon the intention of the parties, and in order to ascertain this fact, the circumstances which surrounded the parties, and their relative situation toward each other, should be considered.

Appeal from Coos.   The facts are stated in the opinion.

*William R. Willis,* for appellant.

*R. S. Strahan and S. H. Hazard,* for respondent.

By the Court, Lord, C. J.:

This is a suit in equity for the settlement of a partnership account.   The complaint substantially alleges, that on the 5th day of June, 1866, S. S. Mann, Patrick Flanagan and James Flanagan (the latter now deceased), entered into a copartnership agreement, for the purpose of mining and selling coal, goods and merchandise, in Coos county, Oregon, and to transport coal to market.   That they furnished an equal amount of capital, and were to be equal in profit and losses; that they continued in business, under said agreement, until the first day of April, 1878, at which time James Flanagan died intestate, leaving the defendant, Ann Flanagan, who was his wife, his only heir.

That on the 3d day of May, 1878, Patrick Flanagan was appointed administrator of the estate of James Flanagan, and is now acting as such; and that on the 1st of July, 1878, the plaintiff, S. S. Mann, was appointed administrator of the partnership estate, and is now acting as such administrator, and carrying on the partnership business by virtue of an

order of the county court, etc.  That said partnership has been fully administered, and the final account filed, and that said administrator is ready to be discharged as soon as the interest of the respective parties can be ascertained.

That James Flanagan, during the existence of said partnership, resided in San Francisco, and sold the coal shipped there by the company, received the money therefor, and wrongfully retained and refused to pay over or account for the same, to the amount of $32,912.72, and at the time of his death had the same in his possession.

That in 1874 and 1875, he applied $7,135.00 of the money belonging to said partnership to the payment of his individual debts and liabilities, and directed and caused the book-keeper of said copartnership to charge said amount to the firm; that a short time before his death he represented to the book-keeper that he had paid debts of the company to the amount of $2,-741.25, and fraudulently caused said book-keeper to credit him with that amount, when he had not paid said debts, but had applied the same to his own use; and that the plaintiff, since his appointment as administrator, has been compelled to pay, and has paid, said debts to the creditors of the firm.

That about the year 1877, Jas. Flanagan had in his possession $400 of the moneys of said copartnership, and had failed to account therefor, but converted the same to his own use. That during said copartnership, from time to time, he took the further sum of $3,680.85, and refused to account for the same; that the total amount of moneys and credits which James Flanagan wrongfully received is $47,828.64.

That during the continuance of said copartnership, Patrick Flanagan drew out of the funds thereof the sum of $10,110.02, which was properly charged to him on the books, and that between the 1st of November, 1874, and the 1st of April, 1878, he wrongfully, and against the protest of the plaintiff, charged to the copartnership $200 per month during all of said time, for his services in the business, and drew from its funds therefor $8,200; that he should be credited on the first

item, $679.37, charged to his account by mistake, leaving the amount drawn by him, $17,640.92.

That P. Flanagan is entitled to receive $30,187.99, and plaintiff, S. S. Mann, $29,481.72, from the assets of said partnership, to make their respective proportions equal to the amount received by James Flanagan, and that to pay them the said sums it is necessary to sell the interest of said James Flanagan in the partnership.

That each partner owned an equal undivided one-third of all the real property, and that it cannot be divided without a sale thereof.

The answer denies that the real estate described in the complaint was partnership property, or used for partnership purposes, except a small part, and alleges that it was the individual property of the partners; denies that James Flanagan wrongfully retained or refused to account for $32,912.72, or any part thereof, but alleges that it was agreed between the partners that James Flanagan should reside in San Francisco and transact the business there, and S. S. Mann and P. Flanagan should reside at Newport, Oregon, and transact the business there; that the firm furnished them and their families houses, gardens, etc., free, and for a long time goods and merchandise for themselves and their families, and in consideration thereof, it was agreed, understood and acquiesced in by each of said partners, that James Flanagan should receive a commission on each ton of coal sold by him; that said sum is the aggregate of said commissions, for all of which James Flanagan rendered his monthly statements, and that the same were duly entered up in the books of said firm, at Newport, by S. S. Mann, or his book-keeper. Denies each allegation of converting other moneys to his use, or causing the same to be entered on the books.

To which answer plaintiff filed his reply, and upon issue being joined the evidence was taken, and the court, after taking the same under advisement, found as conclusions of fact, among other things: "That James Flanagan, in his life-time

and during the continuance of said partnership, wrongfully withdrew from the funds of said partnership, and converted to his own use, the sum of $32,461.14, with which sum he should be charged in the partnership account; that Patrick Flanagan drew from the funds thereof, and converted to his own use, the sum of $17,640.65, with which he should be charged in the partnership account; that S. S. Mann drew from the funds thereof, and converted to his own use, the sum of $18,336.92, with which he should be charged in the partnership account." And the court, after ordering the property belonging to said partnership to be sold, among other things adjudged and decreed that Patrick Flanagan is entitled to receive and draw from the partnership, before the estate of James Flanagan is entitled to receive anything, the sum of $14,820.49, in order to make the amount drawn by him equal to the amount drawn from the funds of said partnership by James Flanagan in his life-time; and that S. S. Mann is entitled to receive and draw from the funds of said partnership, before the estate of James Flanagan is entitled to receive anything, the sum of $14,124.22, to make the amount drawn by him equal to the amount drawn by James Flanagan in his life-time.

The first objection made by the appellant is based upon the refusal of the court to allow the whole amount of commissions received by James Flanagan during the continuance of the partnership. It is urged that the arrangement entered into by the partners at the commencement of the partnership, and continued for some time afterwards, the entries on the partnership books, the manner in which the business was conducted, and the conduct of the partners in dealing with each other, clearly indicates that James Flanagan was to be remunerated for his services, and that such was the understanding and intention of the partners, as manifested by the entire conduct of their business up to his death.

The general rule undoubtedly is, that one partner is not entitled, as against the other partners, or the firm, to any

remuneration or commission for services rendered in the business of the copartnership, unless there is an express agreement to that effect. (Story on Partnership, sec. 182, and cases cited in note, also section 185, and cases cited; Parsons on Contracts, vol. 1, page 197.)

This general rule results from the fact, " that there is an implied obligation in every partner to exercise due diligence and skill, and to devote his services and labors for the promotion of the common benefit of the concern." But this rule, like all general rules, has its exceptions. As where such an agreement may be implied from the course of business between the copartners, or from the nature of the services rendered in connection with the duties and obligations imposed by the copartnership articles upon the several members of the firm.

There can be no doubt that a partner is entitled to be remunerated for his services, if it can be clearly implied from " the course of dealing which the partnership adopts, or other circumstances of equivalent force." (*Marsh's Appeal,* 69 Pa. St., 30; Parsons on Contracts, sec. 203, and cases cited; *Bradford* v. *Kimberly,* 3 John. Ch., 431.)

The application of these principles to the evidence will determine whether the objection of appellant is well taken. It appears from the evidence that the copartnership under consideration was entered into by the parties on the 5th day of June, 1869, and continued until the death of one of the members, James Flanagan, which occurred on the first day of April, 1878.

There was no agreement as to what portion of the business any member of the firm should perform. Soon after the formation of the copartnership, James Flanagan, upon his own motion, as it seems, went to San Francisco and made a contract with an agent to sell the coal of the Newport coal mine, for a commission of fifty cents per ton. For this commission the agent was to sell the coal, become responsible for the sales, and make a return of the accounts thereof to James Flana-

gan, who thereafter and during the existence of the partner-ship continued to reside in San Francisco.    The commission of the agent was paid out of the funds of the partnership— " the proceeds of the sales of coal belonging to the company." But in addition to this commission allowed the agent, James Flanagan retained a commission, or special compensation, for the services he rendered.

The evidence is, that " for several years he retained fifty cents a ton; afterward for some time, thirty-seven and a half cents per ton, and for a small portion of the time, twenty-five cents per ton."    This compensation or commission was retained in this manner:    " James Flanagan made a monthly return to the Newport mine of the net proceeds of coal, after paying all expenses, and the net proceeds show that he retained, as personal commissions, the amounts as above stated." From the commencement of the copartnership until the fall of 1873, S. S. Mann and Patrick Flanagan resided at Newport, Coos county, Oregon; the former having " charge of the store, books and general accounts of the mine, ordering goods, conducting all correspondence," etc., and the latter " superintendent of the mine and all labor outside."

During this last named period, the evidence discloses that S. S. Mann and Patrick Flanagan occupied houses, the property of the partnership, and the grounds and gardens attached thereto, without the payment of any rent therefor, and also received goods, supplies and provisions from the store belonging to the partnership, for their own and the use of their respective families, without any charge.

It thus appears from the evidence, that at the commencement of the partnership, each of the partners betook himself to particular duties, all of which was essential and necessary to the success and prosperity of the copartnership, and that while two members of the firm remained at Coos Bay, to manage the business there, they occupied the houses and lands of the firm, rent free, and supplied themselves and their families with goods and groceries from the company's store, with-

out cost or charge; the other member of the firm resided in San Francisco, superintended the business there, and made return of the sales of coal, and out of the same retained a commission for his services.

This arrangement was acquiesced in by the course of dealing between the partners, and continued until the fall of 1873, when all the partners removed to San Francisco.

It is true there is some evidence tending to show that Mann objected to his partner, James Flanagan, receiving the compensation or commission for his services which he retained, as appeared by "the net proceeds of coal, after paying all expenses." But the letter of Mann to James Flanagan, the manner in which the business was conducted, taken in connection with other attendant circumstances, shows conclusively that the objection was not so much to the allowance of a commission to James Flanagan for the services he rendered, as the amount of commission he charged and retained for such services; or, in other words, Mann thought the compensation was too much, and ought to be reduced; and we think the evidence shows, particularly after the sales increased, there was some reduction in the amount of the commission upon the ton.

That the services performed by James Flanagan were of great advantage, and conduced to the prosperity of the copartnership, is evident from the testimony, and made more manifest by the letter of Mann to James Flanagan, 1872, in which he refers to "the great advantage it has been to the business to have some one at San Francisco who could give his undivided attention to the business."

As before stated, the other partners had remained at Coos Bay, where they and their families were in fact supported by the company. James Flanagan had gone to San Francisco, and his residence there necessarily incurred to him additional expense, without any of the advantages of free rent and supplies, which the other partners enjoyed, and we think there was no error in the court allowing him the commissions

charged the firm from the commencement of the partnership until the fall of 1873, when the existing arrangement seems to have been broken up and all the partners removed to San Francisco. But after the fall of 1873, and until his death, about the first of April, 1878, James Flanagan continued to deduct his commission from the sales of coal, against the repeated protests of Mann, and without any authority express or implied from the firm, or other circumstances from which such authority to take commissions might be implied.

All of the members of the firm were now in San Francisco, and all of them, according to the evidence, were devoting their skill and services for the promotion of the common interests of the copartnership. Nor did the other two members of the firm enjoy, at this time, any peculiar advantages or special privileges, which furnished James Flanagan any reason whatever for his retention of a commission for his services; nor was there anything in the course of dealing which the partnership adopted from this time until the death of James Flanagan from which the right to retain commissions by him might be fairly implied.

The evidence is that Mann daily attended the office, took charge of the Coos Bay correspondence, purchased a portion of the supplies for the miners, and had in fact almost the sole charge of an organization called the Newport Coal Company, organized by Flanagan & Mann, the duties of which were onerous, embracing the issuing of receipts, advertising, employing agents, receiving their returns, and keeping an account of all transactions. These duties Mann continued to perform until the spring of 1877, when he returned to Newport, and from that time until the death of James Flanagan he was engaged in the general supervision of the books and accounts of the firm.

During the whole of this period, Mann neither charged nor received from the partnership any fee, salary or commission whatever for the services he rendered. Nor did Patrick Flanagan receive any compensation for the services he rendered

while he resided in San Francisco; and he testifies that there was no mutual agreement between the members of the firm as to the allowance of special compensation; and further, to the effect that James Flanagan retained a special compensation without any authority from the firm, and against the objections of Mann, who asserted the inequality of such an allowance, and his purpose to require an account of the commissions thus wrongfully appropriated by James Flanagan. He also testifies as to how and by whose suggestion he came to charge the firm the sum of two hundred dollars per month, from the first day of November, 1874—that being the time he left San Francisco and returned to Newport—until the first day of April, 1878, and admits that the money thus received for his services during that period was without the consent of Mann, in fact wrongful and unauthorized, and consents by his stipulation that the sum of $8,200—the same being the aggregate amount thus appropriated—be charged to his account.

The evidence also plainly indicates that James Flanagan himself expected to be required to account for the commissions he had retained. His conversations with other members of the firm, with the book-keeper and others, when the matter of his taking commissions against objection and protest of Mann was brought to his notice, he almost invariably answered to the effect that he would make some settlement or satisfactory arrangement at some future time. He seems to have been under the impression some time before his death that the sale of the mine could be advantageously effected for the common benefit of the firm, and that then he would arrange satisfactorily and settle the matter of commissions.

It is unnecessary to review the testimony further on this point. To our minds it is clear, from the evidence, that there was no express agreement mutually entered into between the partners, nor anything in the course of dealing adopted by the partnership from which an agreement may be implied, which authorized James Flanagan to take extra compensation

or commission for any service which he rendered the firm as a partner, from the fall of 1873 to the 1st of April, 1878, and that the court below did not err in charging the commissions thus appropriated by him during that period to his individual account.

The next item to which objection is made, is the sum of $7,135, charged by the court below to the individual account of James Flanagan. It appears from the evidence, that some time in the month of July, 1874, James Flanagan sent to Mr. Graham, the book-keeper, an item of $1,010 for payment on note and expenses, to be credited to his account, and that subsequently, in 1874, he sent another item of $6,125, which was also credited to his account; but the book-keeper not being able to find any liability to which these sums could be charged, entered them on an account called the " Suspense Account." In respect to this matter, Mr. Graham testifies that " these amounts were in his accounts, and were received at Newport while I was manager there. Mr. Flanagan did not state in his account for what purpose this money was paid out. He afterwards told me that it was an individual note, with interest thereon, that he owed to his sister, Mrs. Kate Mullen." And again, in further explanation, the same witness testifies: " In the accounts which James Flanagan sent me to Coos county, this $7,000 which I have spoken of, was returned to me to be charged to the San Francisco branch of the firm of Flanagan & Mann; that is, to be credited to him as having been paid out for the San Francisco branch, but the account did not show for what purpose it was paid out. It merely purported to be on F. & M. note, and so to be charged. I thereupon charged it up to the suspense account, not knowing exactly what it was for, or where it should be charged. Flanagan afterwards told me that the amount consisted of a note for $5,000, in favor of his sister, and interest thereon— his individual note for his individual indebtedness." And further, in response to the question, whether or not he knew the firm of Flanagan & Mann was not indebted for said sum

of $7,135 at that time, the witness says: " I did not know of any such indebtedness by said firm. I was aware they were not so indebted, and the books did not show any such indebtedness, and it was this fact that caused me to put it in the suspense account. That charge in the suspense account was never adjusted, but still remains as it was charged."

Mann testifies that he " was not aware of these credits to James Flanagan on the books, until a short time before his death." " I positively knew that the above amounts were never paid for any liability of the partnership, and I do know that these several amounts were paid to the sister of James Flanagan in liquidation of his personal note, and interest— to his sister, Mrs. Mullen." Upon cross-examination in reference to this particular item, the witness says: " I have been fully familiar with all the transactions of the partnership since its commencement, and no liability of such an amount could have occurred without my knowledge. James Flanagan himself informed me that he had given his notes to his sister, Mrs. Mullen, for a large amount."

It appears also from the evidence of this witness, that the note was given in consideration of money loaned James Flanagan, and used in carrying on business in the territory of Idaho, some time after 1860, and previous to the formation of the partnership of Flanagan & Mann. Patrick Flanagan testifies that the note due Mrs. Mullen was for " private money advanced to James Flanagan when living in Idaho, and before the partnership existed," and that neither the firm of Flanagan & Mann, nor Mann, nor himself, to his knowledge, was indebted to Mrs. Mullen to any extent whatever—" we never owed her a dollar."

There is other evidence bearing directly upon this matter, but sufficient has already been referred to, to make it evident that this sum must be charged to the account of James Flanagan. Nor do we deem it necessary to review the testimony in respect to the other remaining items in the controversy, further than to present the result of our investigation.

In addition, we find that James Flanagan should be charged with the sum of $1,782.33, instead of the sum of $2,741.25 as alleged, the difference being in the disallowance of the bill of Berryman & Doyle for the sum of $958.92; that he should be charged with the sum of $3,680.86, the same being the amount of money and other things he drew out of the partnership for his individual use, and for which he should be made to account; and also the sum of $400, which, by the direction of James Flanagan, was wrongfully charged to the account of Patrick Flanagan; making, in the aggregate, the sum of $32,267.66, which James Flanagan wrongfully drew from the funds of the partnership, and converted to his own use, instead of the sum of $32,461.14, as found by the court below. That Patrick Flanagan drew from the funds of the partnership, and converted to his individual use, the sum of $17,640.65, and that S. S. Mann drew from the funds of the partnership, and converted to his own use, the sum of $18,336.92; and that Patrick Flanagan is entitled to receive and draw from the partnership, before the estate of James Flanagan, deceased, is entitled to receive anything, the sum of $14,627.66, instead of the sum of $14,820.49; and S. S. Mann the sum of $13,930.74, instead of the sum of $14,124.22, as found and decreed by the court below; and that with these exceptions and modifications, the decree of the court below is in all things affirmed.