Argued July 7; reversed September 19; rehearing denied
October 24, 1933

# In re BERGER'S ESTATE

(25 P. (2d) 138)

*Wilber Henderson,* of Portland (Bert W. Henry, of Portland, on the brief), for appellant.

*David E. Lofgren,* of Portland, for respondent.

BAILEY, J. The executor of the will of Robert Berger, deceased, appeals from an "order, judgment and decree" of the probate department of the circuit court for Multnomah county, Oregon, allowing the claim of Olive Gruver against the estate, which, together with interest, exceeds $15,000.

Robert Berger died testate in Multnomah county in July, 1929, and immediately thereafter Ben Riesland, executor named in the will, was appointed and qualified as such. On April 2, 1930, Olive Gruver presented to the said executor her original claim, and on May 15 presented an amended claim. Both of these were disallowed by the executor and a hearing was thereafter had on the second or amended claim.

A part of the amended claim which was allowed by the probate court was based upon a letter written by the decedent to the claimant under date of December 11, 1916, as follows:

"Minden, Nebr., Dec. 11, 1916.

Dear Miss Gruver:

"In conformity with our oral agreement in the summer of nineteen hundred and fourteen, 1914, you have furnished funds as follows to finance our business, namely:

Balance due Olive Gruver on settlement Oct. 19, 1914, $585.37   Five Hundred Eighty-five and 37/100 dollars.

Proceeds of Montana ranch used in the business, $3,300.00   Three Thousand Three Hundred Dollars.

Paid on Ellen Jakobsen note, $1,300.00   One Thousand Three Hundred Dollars.

Cashing note through Trippensee's in 1915, $400.00   Four Hundred Dollars.

Cashing note through Trippensee's in 1916, $400.00   Four Hundred Dollars, with the understanding that you are to hold all contracts though taken in my name and the proceeds thereof in whatsoever form for your own use with the further understanding that you pay for goods each month, taking advantage of the discount for cash, and the commissions of every salesman when they become due which shall be on collection of the contract, applying the balance as a credit on my indebtedness to you until such time as you are repaid or may receive other satisfactory security. You, too, are to receive a one-half interest on our profits from the sales of C. F. Annis and E. L. Sisk and are to recompense yourself for these in some equitable way, your commissions and mine to offset each other since March 10, 1915, so there is an unknown balance due you since our last settlement from this source which it will be easy for you to have equitably adjusted, in case of such accident that I might not be present. Realizing the extremities to which you might be put under simply an oral agreement I am anxious to reduce this to writing for the purpose of simplifying your settlement with my estate.

"Yours truly,
"R. Berger."

The probate court allowed the first item mentioned in the letter, to-wit, the sum of $585.37, with interest at the rate of 6 per cent per annum from October 19, 1914; and the second item of $3,300 with interest thereon at 6 per cent per annum from November 1, 1915. The other three items mentioned in the letter, to-wit, one of $1,300 and two of $400 each, were, according to the claimant, included in and a part of the item of $3,300.

In addition to the foregoing allowance the court granted the claimant $1,049.40, with interest thereon at the rate of 6 per cent per annum from December 1, 1921, based upon an alleged understanding between claimant and Berger that the claimant was to have the discount of 2 per cent saved by paying within a certain time for the purchase of supplies used in their operations. Claimant was further allowed $3,600 with interest at 6 per cent from May 1, 1924, based upon an alleged implied contract between the claimant and the decedent for services rendered by the claimant in the collection of certain warrants held by them as partners.

Other items included in the amended claim against the estate amounting to approximately $500 were either withdrawn by the claimant or disallowed by the court.

The executor, at or before the time of the hearing of the claim by the court, filed an answer denying that the estate was indebted to the claimant in any sum whatsoever, and further alleging that each and every one of the items included in the claim was barred by the statute of limitations of the state of Oregon. In order to avoid the bar of the statute the claimant asserts that the various items of the claim were due

from the partnership of Berger and Gruver and that there had not been at the time of Berger's death a dissolution of the partnership or an accounting between the partners. Although these items comprising the claim were asserted as connected with and growing out of the partnership transactions, nevertheless the probate court allowed Miss Gruver's claim in full, with the exceptions above noted, against the estate of one of the partners, with interest thereon from fixed dates, said dates, with only one exception, being more than six years prior to Berger's death.

For some time prior to 1912 Robert Berger had been engaged in the sale of "Planetariums", schoolroom equipment designed to demonstrate the movement of the bodies in the solar system. These were sold principally to school districts. In the fall of 1912, while canvassing in Montana, Berger met Miss Gruver, who was at that time teaching in a small country school. Arrangements were made between them whereby Miss Gruver resigned from her school position and for some two years engaged in selling planetariums under Berger on a strictly commission basis.

Sometime in the autumn of 1914 a limited partnership was formed between Berger and Miss Gruver whereby each was to receive one-half the profits of their combined sales and pay one-half of their expenses. Mr. Berger at that time had solicitors working under him, and their earnings were not included in the partnership arrangement between himself and Miss Gruver. Sometime prior to May 1, 1919, Miss Gruver was given one-half of the sales made by a solicitor named Annis, and on the last date named she became an equal partner with Berger in all sales made by themselves and all the solicitors.

In the summer of 1921 Mr. Berger ceased active soliciting, due to the fact that' most of his time was required in caring for his invalid daughter, and by the end of that year all active soliciting by the partners and their salesmen had practically ceased. At the time Mr. Berger discontinued active canvassing there were outstanding warrants belonging to the partners aggregating some $37,000 or $38,000, and the collection of most of these was handled by Miss Gruver, who testified that she collected thereon over $21,000 in 1921, over $15,000 in 1922, and something over $796 in 1923. In 1924 she turned over the remaining warrants to Mr. Berger. One of the items of her claim is for $100 a month from May, 1921, to May, 1924, for collecting these warrants, and is based, as she contends, on an implied contract to pay her the reasonable value of her services.

In the latter part of 1922 Miss Gruver, who was then residing in Portland, which was then and continued until his death to be the home of Mr. Berger, moved to Los Angeles, where she has since resided, and the only time thereafter that she saw Mr. Berger was in the summer of 1924, when he came to Los Angeles to discuss with Miss Gruver claims asserted against them by Ahlers, one of their salesmen, and to take up other matters. At no time after moving to Los Angeles did Miss Gruver make any written demand upon Mr. Berger for payment of any part of the claim allowed by the probate court.

With this general synopsis of the situation, we will review in more detail the evidence relating to the transactions between Berger and Miss Gruver.

The documentary evidence introduced by the claimant is somewhat meager and consists of diaries con-

taining the accounts between Berger individually and the Trippensee Manufacturing Company and between the partnership and the Trippensee Manufacturing Company, manufacturer of the planetarium above mentioned, accounts of sales made by Berger, his solicitors and by the partnership of Berger and Gruver and its solicitors, diaries of Miss Gruver for the years 1919, 1920 and 1922 showing the monthly statements and accounting between Berger and Miss Gruver, four checks signed by the claimant, the letter above quoted, another letter dated August 9, 1920, and a few letters between claimant's attorney and certain banks in which the claimant and the partnership had accounts.

The executor introduced in evidence the diaries of the decedent beginning with the year 1914 and ending with the year 1929. Those diaries contained at first the accounts of Berger with the Trippensee Manufacturing Company and with the solicitors. They also contained the accounts between himself and Miss Gruver. In addition to the diaries or journals, the executor introduced numerous letters and statements from the claimant and others which it is not necessary at this time to describe in detail. The only diaries, three in number, which had been kept by the claimant and were introduced in evidence, relating to any extent to the transactions between herself and Berger were those for the years 1919, 1920 and 1922. She was unable to account for her diary of 1921 and those prior to 1919 relating to settlements between herself and Berger.

Each of the decedent's diaries, from and including that for 1914 to and including that for 1923, shows the amounts due from or owing to himself from Miss Gruver. In referring to these diaries kept by the in-

dividual partners, counsel for claimant correctly says: "The record of the partners consist of individual diaries kept by both partners, which were balanced at the end of each month when the partners would compute their profits, expenses and losses and divide the profits or share the losses as the case might be. * * * Throughout the entire selling campaign the diaries show a settlement at the end of each month or as soon after the end of the month as the partners could get together and figure out their expenses and balance their accounts and sometimes one would be entitled to a credit and sometimes the other partner."

The claimant, when questioned about the absence of one of her diaries, testified as follows:

"Q. And are all the books here for the entire partnership transactions?

"A. Well, Mr. Berger had just the same as I had."

She further stated: "Mr. Berger had the same, practically the same records as I had, and we always had the settlement in his diaries."

Beginning with 1914 up to the end of 1922 Miss Gruver had access to, examined and apparently approved the Berger diaries for those years. His subsequent diaries had not been seen by her, due undoubtedly to the fact that the parties lived in different states.

Attention is now directed to the diaries with reference to the partnership transactions and settlements between the partners. All the diaries referred to up to the end of 1918 are those of Berger, as Miss Gruver's diaries relating to the dealings between the parties prior to 1919 were not produced at the trial. The record is not clear as to whether or not she kept any such diaries prior to 1919.

Under date of February 4, 1914, appears the entry of a note from Berger to the Trippensee Manufacturing Company for $400, due six months after date. This note was apparently renewed, according to the entries in that diary, on August 24 of the same year, and it is apparently one of the notes to the Trippensee Manufacturing Company which are listed in the letter above quoted, as having been paid out of the $3,300 mentioned in that letter. Under date of August 1, 1914, appears an item of settlement of a balance due Miss Gruver of $750.06, $500 of which is paid on September 9 and the balance of $250.06 on October 17 of the same year.

Under date of October 19, 1914, appears a settlement with Miss Gruver showing that she is entitled to $585.37, which is the same amount mentioned in the letter above set out, and allowed by the trial court.

Dated November 6, 1914, there appears the first entry concerning the partnership of Berger and Gruver and thenceforth on alternate pages of the 1914 diary are entries of the partnership of Berger and Gruver and of Berger individually.

The Berger diary for the following year does not contain much that is important here except that under date of March 9 it shows a settlement with Miss Gruver for her expenses from October 19, 1914, to date, which is apparently one of the settlements referred to in the letter quoted.

In Berger's diary for 1916 appears a statement of a balance due Miss Gruver on December 31, 1916, of $1,934.37. In computing this balance there is included the sum of $585.37, being the balance due her on October 19, 1914, with interest added amounting to

$70.24. Reference is also made to the account with Larabie Brothers' bank, a Trippensee note of $400 and other items included in the letter above quoted.

In the Berger diary for 1917, under date of January 31, appears this notation: "Due Olive Gruver on settlement, $1,934.37". Dated February 1 of the same year is the following entry: "Due Olive Gruver, same as 1/1/17, $1,934.37". So far as we have been able to find, nothing further appears in any other diary or in any other documentary evidence relative to this balance. The 1917 diary of Berger shows regular monthly settlements between Berger and Miss Gruver and in most instances balances of small amounts found due Miss Gruver. Under date of December 18 the statement shows an investment of each of the partners in stock of goods, $1,573.10. Miss Gruver's balances aggregating $1,460.97 for the months of July to December, inclusive, were charged against her half of goods on hand.

The 1918 Berger diary also continues to show monthly settlements. Two of these months, July and August, show balance of indebtedness due from Miss Gruver to Berger of $205.04 and $235.45 respectively. In the October settlement there is owing a balance of $572.99 to Miss Gruver, from which is deducted $2.86 interest on a loan of $644.57, presumably that indebtedness later mentioned as the Eaton loan, and $400 of the $644.57 due Miss Gruver is applied on the payment of this loan.

We now come to the year 1919, when Miss Gruver's records contain the first reference to settlements between herself and Berger. In her 1919 diary under date of January 28 is this notation in her own handwriting: "Dr. to Berger on Eaton loan carried from

December, $244.57. Interest on same one month, $1.63. G.'s indebtedness end of January [presumably for that month's transactions alone], $392.35. Total, $638.55''. There was, however, at the end of that month, enough money from collections to cancel her indebtedness and leave a balance of $38.89 due her, which was paid. During most of the remaining part of the year and at the end thereof Miss Gruver was indebted to Berger. For example, in her own diary entries appear these statements: ''$1,375.83—what I owe Berger 11/30/19;'' ''$1,125.83—what I owe Berger at end of 1919''.

The monthly settlements during the year 1919 between Berger and Miss Gruver, noted in both diaries, check in all respects, each partner making notation of what is due from one to the other. The same is true of the entries kept by both partners for the year 1920. For these two years, when balances were due from Miss Gruver to Berger, however, checks were not drawn monthly, but the balances were carried forward and Miss Gruver's earnings applied thereon. There were during the entire year 1920 balances owing from Miss Gruver to Berger, beginning with $1,125.83 and going as high as $1,891.68, her indebtedness being reduced to $666.39 at the end of December. These balances due from Miss Gruver to Berger were carried forward in her book with notation as to what she owed at the end of the month, such as, ''What I owe Berger at end of February,'' etc.

Miss Gruver's records for 1921 showing settlements between herself and Berger are missing, but such settlements are shown in Berger's diary for that year, and every month a balance is found due Miss Gruver and is shown to have been paid either at the end of the month or at the end of the period. For example,

the balances due for February, March and April were paid in May and those for October, November and December were paid in one lump sum the following February.

The diaries of both partners for 1922 contain the monthly settlements, with the balances in favor of Miss Gruver, all of which are shown to have been paid, the January, February and March balances being paid in one lump sum in April. In one instance at least, large sums amounting to $1,934.37 were advanced to Miss Gruver before settlement.

During the month of July, 1922, Berger paid by three checks a note of $3,543.92 given by himself to Miss Gruver for the purchase price of some property in Overlook addition to the city of Portland.

During the year 1923 the records of the two partners also are in accord and Miss Gruver is paid whatever balances are due her. In her entry of February 26, 1923, is this statement: ''I ask 1st Nat'l Miller [First National Bank of Miller, South Dakota] for $400 to be placed in savings certificate. Certificate rec'd 3/7/23. This is due me on lot 17, Portland, Oregon''. A serious dispute arose between the partners as to the right of Miss Gruver to this $400 and it was, according to Berger's letter to her, one of the reasons which impelled him to visit her in Los Angeles in the summer of 1924. Upon learning of this transaction Berger withdrew from Miss Gruver the right to draw checks on money in his name, and shortly thereafter Miss Gruver returned to him the remaining warrants in her possession.

As has already been said, active operations by the partners ceased in 1921, and the expenses incident to sales and purchases of goods were therefore elimi-

nated, which undoubtedly accounts in a large measure for the fact that Miss Gruver had balances due her for the years 1922 and 1923 as well as for the latter part of 1921. In this connection it should be stated that collections were made by Miss Gruver, principally, and the money was deposited in Berger's name, against which funds Miss Gruver had drawn checks from 1915 to 1923 or 1924.

The partners' diaries from 1923 on have little, if any, importance here. Under date of May 22, 1924, there is a record in Miss Gruver's diary of the return by her to Berger of warrants amounting to $347, and under date of April 23, 1929, entry of the receipt from Berger for $31.26 from warrants.

When Miss Gruver moved to Los Angeles she took with her all warrants, contracts and such correspondence as they had relating to the partnership. As a witness, after stating that she had not, to her knowledge, written to Mr. Berger about the claims later asserted by her and allowed by the probate court, Miss Gruver said that she had asked him about payment at different times, and when questioned as to what answer he gave, if any, she replied: "Well, he always said, 'You don't have to worry; you have all the paper, and it is in the vault, and you have access to the bank account, and we will always have plenty of paper on hand'." At another time during her testimony she was questioned by her attorney as to a final settlement, and testified as follows:

"Q. Did you ever have any final settlement, or did you ever try to get any final settlement with Mr. Berger?

"A. Yes. I have tried at different times to get a final settlement.

"Q. When was the last time you tried to get a final settlement out of him?

"A. When he was down at * * * he came down to Los Angeles, and he said that he would settle up.

"Q. Did you start to take a final settlement?

"A. Yes. We did.

"Q. Did you conclude it?

"A. No. We never did.

"Q. What was the reason it was not concluded, if any, if you know?

"A. Well, he just was not willing to finish up was all, I guess.

"Q. Did he make any promises to settle and then did not meet up, or did he just say he would not settle? What were the facts?

"A. Oh, he said * * * well, it was * * * he had lost some paper; I don't know * * * some * * *.

"Q. Some memorandum?

"A. I don't know whether it was a deed, or what it was; and he wanted me to sign a paper, sign something over to him, and we were working at the * * * trying to settle up and going over Mr. Ahlers's accounts, first, and we got rather tired, and so we took a little street-car ride, and as we went through the city * * * and so he suggested that we stop off down there and go in and make out this paper, for we might not be down there again, and I didn't want to sign it. I didn't talk to any attorney, or anything, about it. I said, 'We'll wait till we get this settlement made out,' but he said, 'Well, we'll go back and settle up, but we might not be down here again,' and so I signed the paper, and when that was signed up, he went back to the house, and he was in a rush to get home then, and there was no more settlement done.''

Yet she does not say that she mentioned those items allowed by the court.

At the time Mr. Berger made his trip to California in 1924 considerable correspondence had passed between himself and Miss Gruver, relative to the Ahlers claim. Mr. Ahlers was one of the solicitors who had worked for the partners and was making demand for unpaid commissions.

After Mr. Berger returned to Portland and during the year 1924 he wrote to Miss Gruver about his trip and, with reference to the $400 withdrawn by her from the bank, said: "I went to Los Angeles with a twofold object in view—one was to get a full settlement from you of Ahlers's account, but the primary object was for us to talk over this arbitrary $400 deal or action. But when I found that we made such very slow progress in the former matter I knew well that if we took up the latter it would draw out a conference to an extent that I could not afford under the circumstances, so I didn't broach the matter".

At different times after Berger's trip to Los Angeles, Miss Gruver wrote to him, requesting him to send her half of the collections, stating that she was badly in need of funds, but in none of her letters or the letters from Berger to her is any mention made of any of the items contained in that part of the claim allowed by the trial court. She did, however, claim that Mr. Berger should pay her interest on some of their dealings as individuals, and for her trouble.

The funds of the partnership were kept in several banks in different states. In January, 1919, the partnership had the sum of $6,633.27 deposited in four banks, and on the next day made a deposit of $1,063. On February 1, 1920, the partnership had approximately $4,500 in banks.

The item of $585.37 mentioned in the letter of December 11, 1916, and allowed by the trial court represented an indebtedness which Berger individually owed Miss Gruver for commissions prior to the inception of the partnership. This is clear from the facts in the case. According to claimant's own testimony, $1,300 of the $3,300 realized by her from the sale of her Montana ranch was used by Berger in payment of his mortgage to Miss Jakobsen. These two items, to wit: $585.37 and $1,300, therefore, had nothing whatever to do with the partnership. At least one of the payments of $400 on a note to the Trippensee Manufacturing Company, mentioned in the letter above quoted, was for an indebtedness owing by Berger to that company prior to the date of forming the partnership, and that is probably true of the second note, as there is nothing in the record to indicate that the partnership gave such a note, and if, on the other hand, the partnership was indebted in that amount, the payment thereof should not be charged to Berger. The remainder of the $3,300 is not entirely or satisfactorily accounted for, although the claimant introduced checks showing payment by her under date of December 22, 1915, of $211.09 to the Empire Investment Company, and one dated December 4 of the same year to the Overlook Land Company of $323.27, both of which checks, she stated, were applied on Berger's individual indebtedness and were a part of the $3,300.

It is the claimant's contention that the $3,300 realized by her from the sale of property in Montana was loaned by her to the partnership and that $1,300 thereof was advanced by the partnership to Berger to pay the Jakobsen mortgage. This, however, does not accord with claimant's own testimony. If her con-

tention be true that the $1,300 was loaned by the partnership to Berger, Berger's indebtedness would be to the partnership and not to Miss Gruver. One partner can not sue another partner, before an accounting between them, for an indebtedness which the other owes the partnership.

We quote from claimant's brief: "In view of the fact that the school supplies sold were purchased from the Trippensee planetarium people, there is no doubt that the two $400 items are for material used by the partners in conducting their business". If this statement be correct, Berger would not be liable in any event for more than one-half, or $400. If he were to pay to Miss Gruver out of his own funds her entire advances to the partnership, he would be in exactly the same position toward the partnership that she had been before he made the payment.

The accounting and settlements between the partners month after month and year after year refute the contention that the items claimed against the estate were due the partnership from Berger. Any obligation of Berger, evidenced by the writing of December 11, 1916, on which Miss Gruver bases her claim, was to her and not to the partnership. Miss Gruver admits as much when she demands and receives the approval of the probate court for interest on the items therein for herself from a time prior to the date of said letter.

■ The evidence points strongly to the fact that the indebtedness due Miss Gruver on December 11, 1916, the date of the letter set out above, must have been discharged. The items of $585.37 and $3,300 are not referred to in any of the diaries after February, 1917, and only then by the statement of Berger that he is indebted to Miss Gruver in the sum of $1,934.37, and

which amount includes, as has been pointed out, the $585.37 and some of the $3,300. After that time we find Miss Gruver paying Berger interest and principal on a mortgage held by him against her. We find admissions in her diaries for a period of about two years that she is indebted to Mr. Berger, at one time in a sum amounting to almost $1,900. We hear her state that during the seven years prior to his death, when she was living in Los Angeles and he in Portland, she never wrote to him about payment of his alleged indebtedness to her. We learn that during that period she saw him only once, which was in 1924 when he came to Los Angeles. We listen to her statement that while he was in Los Angeles he promised to have a settlement with her before leaving, but left apparently without discussing to any extent, if at all, any of these claims she now asserts, and without any later complaint by letter from her to him concerning his departure before the settlement. We review transactions between them, individually, in which he gives her notes and securities for his indebtedness to her, and finally discharges his obligations. We find her for many years invested with written authority to pay herself from the proceeds of their sales the indebtedness due her from him, and with sufficient funds in the banks on which to draw. We see her drawing on the banks for money to pay different claims against the partnership, and in one instance paying herself out of money in Berger's name for a balance which she claimed, and he denied, to be due her on other than partnership matters. We are reminded of how insistently she demanded interest from Berger on certain private deal- ings with him when she thought she was entitled to it. We bear in mind that the letter on which these claims

were based was prompted by his realization, as stated by him, of "the extremities to which you [Miss Gruver] might be put under simply an oral agreement", and "I am anxious to reduce this to writing, for the purpose of simplifying your settlement with my estate". And we see in how business-like a manner she reminded Berger of the amounts due her from their partnership dealings and demanded her share at once because of her need of money. With this picture before us, it is difficult for us to believe that any part of the indebtedness represented by the writing of December 11, 1916, remains unpaid.

The letter of December 11, 1916, hereinbefore quoted, is, taken in connection with other proof, evidence of an indebtedness from Mr. Berger to Miss Gruver, and not from the partnership to her, if a partnership as such can be indebted to one of the partners. If taken as an indebtedness from the partnership to Miss Gruver, the claimant's case must fail, as this writing could not, under that construction of it, be used as evidence of any indebtedness from Berger to her, and therefore the only evidence in the case of an indebtedness from Berger to her for the two items of $585.37 and $3,300 would be her uncorroborated oral testimony. This would not satisfy the requirements of § 11-504, Oregon Code 1930, that no claim disallowed by the executor shall be allowed by any court, "except upon some competent satisfactory evidence other than the testimony of the claimant".

The two items in Miss Gruver's claim of $585.37 and $3,300 were due from Berger to her as far back as December 11, 1916. No interest or any part of the principal, according to the claimant, has ever been paid, nor has the time of payment thereof been ex-

tended. These items in Miss Gruver's claim, if not already paid, are therefore barred by the statute of limitations. See § 1-204, Oregon Code 1930.

■ The item of $1,049.40 included in Miss Gruver's claim against the estate represented the 2 per cent discount allowed the partnership in the payment of the Trippensee Manufacturing Company's bills. Miss Gruver asserts that she is entitled to this discount on Mr. Berger's promise that she should keep it for her services in paying the bills. Additional authority for retaining this 2 per cent is designated by claimant in the writing of December 11, 1916, in which letter Mr. Berger stated, after referring to the different items of indebtedness due her, that she was "to hold all contracts" taken in his name, and the proceeds thereof, "for your own use, with the further understanding that you pay for goods each month, taking advantage of the discount for cash * * *" We find nothing in this wording which would authorize Miss Gruver to retain the 2 per cent for her own use. She says that she did so prior to 1916, although we have found no documentary evidence to that effect, and that shortly thereafter Mr. Berger objected to her keeping the discounts in the future. She, however, maintains that she was, under that agreement, entitled to it up to the time the partnership ceased to purchase supplies. Nowhere do we find any written demand upon Mr. Berger for this 2 per cent, and Miss Gruver states that she did not write any letter to him demanding the same. Practically every month Miss Gruver and Mr. Berger had their settlements and in arriving at any settlement they took into consideration the gross amount realized from their sales and deducted therefrom their expenses and costs of supplies; and during the later years divided the profits equally. In these various settlements Miss

Gruver computed and received one-half of the discount which she is now claiming. She, however, desires also to recover now against the estate a full 2 per cent.

The letter of December 11, 1916, as we have already stated, does not support claimant's contention that she was entitled to the 2 per cent discount for her own use, and there is not any competent satisfactory evidence other than her testimony supporting a claim for such allowance. In support of her contention, however, she claims that she used her own money in paying the different bills owing to the Trippensee Manufacturing Company. When questioned closely she was unable to designate on what banks the checks were drawn. In going through the documentary evidence it is apparent that the checks in payment for these supplies were drawn on the accounts standing in the name of R. Berger.

The fourth and last item of Miss Gruver's claim is for the amount of $3,600, based upon an alleged implied contract for the payment to her of $100 per month for her services in collecting warrants for three years beginning in May, 1921, and ending in May, 1924. Reference has previously been made to the fact that Mr. Berger stopped active canvassing sometime in the summer of 1921, at which time the partnership had on hand between $37,000 and $38,000 in warrants and contracts. It is Miss Gruver's contention that for three years she spent all of her time exclusively in the collection of some $37,000 of these warrants. The statements of amounts collected annually show something over $21,000 for 1921, over $15,000 in 1922, and something over $796 for 1923. She does not contend that there was any express contract between herself and Mr. Berger for any compensation whatever for the work which she was doing in collecting these warrants,

and she did not, during his lifetime, present to him any claim for her services in that connection. Well over half the amount collected by her was taken in during 1921, very little in 1923, and nothing, so far as the evidence shows, in 1924, during which year she returned the remaining warrants to Mr. Berger. She does, however, demand payment at $100 per month for the entire year 1923 and practically five months of 1924.

In referring to her entering into a partnership with Mr. Berger, Miss Gruver testified as follows:

"Q. Well, now, what did you do for your partnership interest, anything?

"A. I was * * * he took me in first as a partner and we were equal partners, in our own individual sales, because I was doing a lot of the writing and helping that way always, if it was a rainy day, and we were not able to get out.

"Q. Let me interrupt you: you are not answering my question. What did you pay or what did you agree to pay as your contribution toward the capital of this enterprise?

"A. I was helping with the collections, was the reason that we divided up equally on the sales, because I was spending extra time to do this report work."

■ From this testimony it might be assumed that it was Miss Gruver's duty to proceed in the collection of the outstanding warrants in order to be entitled to one-half of the profits. Her testimoney is very indefinite as to how much actual time she spent in this work, although she does make a general statement that it took practically all of her time. The evidence, however, does not bear out this statement in results obtained for the years 1923 and 1924. The record also indicates that some, at least, of Mr. Berger's time was taken up in adjusting the differences between Mr. Ahlers and the partnership and in the collection of some of the warrants.

Miss Gruver's failure to discuss with Mr. Berger the question of compensation for this work and her failure to present any claim therefor to him during his lifetime would indicate that she did not expect compensation for this work. She was interested in receiving one-half of the profits from the warrants, yet, according to her claim, she is demanding that Mr. Berger's estate alone pay her entire salary for this work for a period of three years. In her brief the statement is made that some collection agent testified that the reasonable value of such services would be 15 to 20 per cent, and that she was demanding less than one-half that amount. If the estate were to pay her the entire amount which the trial court allowed on this item of claim, it would be paying approximately 20 per cent on the part Mr. Berger received from her collections.

■ Claims against a decedent asserted for the first time against his estate should be carefully scrutinized. Applying this principle to the item last above mentioned and bearing in mind the conduct of the parties to the partnership, the reason why Miss Gruver became a partner and her failure to assert a claim during the lifetime of decedent, we are led to the inevitable conclusion that there was no implied contract or understanding concerning compensation for her services in collecting these warrants. This item, therefore, is disallowed.

■ It is difficult to label this proceeding either an action at law or a suit in equity. Claimant has not asked for an accounting of all partnership transactions, but for the allowance of certain stated amounts. All the documentary evidence in existence at the time of the trial relating to the partnership was, according to the witnesses, introduced in evidence. When any question arose about the admissibility of evidence the

litigant offering it, whether the claimant or the executor, asked that it be received "under the rule". If this be considered as a suit in equity, and under the authority of *In re Will of Pittock,* 102 Or. 159 (199 P. 633, 202 P. 216, 17 A. L. R. 218), and *In re Pittock's Estate,* 102 Or. 47 (201 P. 428), the circuit court had authority to try it as such, we must try it *de novo* here. If, on the other hand, it be considered as an action at law, we are, under authority of § 3, Article VII, Oregon Constitution, with the entire record before us, permitted to go into the record, since error was committed by the trial court, and, if we can determine what judgment should have been entered in the court below, direct such judgment to be entered in the same manner and with like effect as decrees are entered in equity cases on appeal to this court. Whether, then, we regard this as a suit in equity or as an action at law, we are of the opinion that the judgment or decree of the trial court should be reversed and that the claim allowed by the trial court against the estate should be rejected and disallowed. The cause is remanded to the circuit court with direction to enter an order in accordance with this opinion. Neither party will recover costs in this court.

RAND, C. J., BEAN and CAMPBELL, JJ., concur.