Argued June 16, affirmed as modified November 9, 1960

## McBRIDE *v.* FITZPATRICK ET AL
### 356 P. 2d 947

*Roger Tilbury,* Portland, argued the cause and submitted a brief for appellants.

*Robert C. Wall* and *Carlton Reiter,* Portland, argued the cause for respondent. On the brief were Stern, Reiter, Day & Anderson and Robert C. Wall.

Before McAllister, Chief Justice, and Warner, Sloan, O'Connell and Millard, Justices.

O'CONNELL, J.

This is a suit brought by a partner against his co-partner and others for the rescission of a partnership dissolution agreement and for an accounting. Defendants appeal from a decree for the plaintiff. Plaintiff cross-appeals.

On September 4, 1954, plaintiff McBride and defendant Paul Fitzpatrick entered into a partnership for the purpose of conducting an automobile sales business at Milwaukie and Bend, Oregon. At that time Fitzpatrick owned and operated a used car business at Milwaukie and he had obtained a Lincoln-Mercury franchise for Bend. McBride agreed to contribute $14,000 in cash to the partnership, which was to make him a "full partner" in both the Milwaukie and Bend businesses. This amount was paid into the enterprise. Later, other contributions were made which brought McBride's total contribution to $19,000. The partnership business was carried on by Fitzpatrick alone until February, 1955, when McBride moved to Bend and there participated in the business. McBride supervised the construction of a building for the partnership business and after it was completed he worked as an automobile salesman and in the parts department in the Bend agency. After the partnership had been in existence for approximately one year, Fitzpatrick suggested that the businesses at Bend and at Milwaukie be separately incorporated. This was done after negotiations had been carried on by the partners as to the respective interests which they should receive in the proposed corporations. It was agreed that McBride would receive a 40% interest in the Bend corporation and that Fitzpatrick would receive 60% of the Bend corporation and all of the partnership interest in the Milwaukie

corporation. McBride received $10,000 in stock in the Bend corporation and a corporate note for $10,000. Fitzpatrick received $15,000 in stock and a corporate note for $15,000, plus the Milwaukie business. The parties signed a buy and sell agreement for their interests in the stock.

Soon thereafter disharmony arose and it was agreed that Fitzpatrick would purchase McBride's stock for $10,000, of which $5,000 was to be paid within a few days after the execution of the agreement and $1,000 in annual installments. About two and one-half months after Fitzpatrick had purchased McBride's interest, the Bend corporation sold the building in which it was carrying on its business and took back a ten-year lease. The sale price of $65,000 was approximately $13,000 greater than the book value of the building. From the proceeds of this sale, Fitzpatrick paid McBride the $5,000 called for as the initial payment under their contract. Soon thereafter McBride, suspecting that the division of the assets was unfair, asked for an audit which Fitzpatrick permitted. On July 24, 1956, plaintiff filed the present suit. The trial court entered a decree awarding a judgment in favor of plaintiff and against defendant, Paul Fitzpatrick, for $17,334.78, together with interest at 6% from September 30, 1955, the date of the dissolution of the partnership, and further decreed that the judgment be a lien on all of the assets of the defendant corporations and on all of the stock of the Fitzpatricks.

■■ On appeal the defendants state that they are not seriously concerned with the money obligation which the decree imposes upon them (because, they assert, it is virtually the same amount which was arrived at by the parties themselves in evaluating McBride's

interest) but they object to the basis upon which the decree was entered. The court's decree recites that the defendant, Paul Fitzpatrick "did defraud plaintiff in the dissolution and termination of the partnership." Defendants contend that the evidence did not establish that Paul Fitzpatrick was guilty of fraud. We think that this contention is sound. However, Fitzpatrick did make representations to McBride concerning the latter's interest in the partnership, and the evidence is sufficient to convince us that these representations were not true. Proof of scienter is not necessary for rescission. The lower court's decree of rescission can, therefore, be sustained on the ground of an innocent misrepresentation of fact. The decree should be so modified.

■ Plaintiff's cross-appeal attacks the decree on three grounds, which we shall now consider. As a first ground it is contended that the court erred with respect to the valuation of the partnership building at Bend. We mentioned above that the building was sold for $65,000 by the Bend corporation approximately two and one-half months after the dissolution of the partnership. At the time of the dissolution of the partnership the building was carried on the partnership books at a value of $47,137.07. Plaintiff argues that since the trial court found that the corporations at Bend and Milwaukie were created as a part of a device to shift the assets between the two businesses and thus to deceive plaintiff as to his fair share in the partnership, the sale of the building by the Bend corporation should be considered as an integral part of the alleged scheme and that the profit made on the sale should be divided between the parties.

The plaintiff asks us to use the sale price of

$65,000 as the value of the building at the time of the dissolution of the partnership. Even if the lower court's premise of fraud in the dissolution agreement is accepted, still there is no substantial evidence to show that in the evaluation of the building at that time Fitzpatrick knew or had reason to know that it was worth more than its book value. Even more important is the fact that McBride was in an equally good, if not better, position than was Fitzpatrick to know what the building was worth. McBride had been a building contractor for a considerable number of years. He supervised the construction of this very building whose value is now in dispute. There is nothing in the evidence to show that Fitzpatrick made any representations to McBride as to the value of the building. For these reasons, it must be assumed that McBride accepted the book value of the building as a fair estimate of its worth in computing the dollar value of his share in the partnership assets at the time of the dissolution.

■ Plaintiff contends that the court erred in the evaluation of the dealer's reserves held by the bank in Bend and the bank in Milwaukie as security for the performance of the automobile contracts sold by the partnership to these banks. The general character of these reserve accounts is described in the following quotation from *Commissioner of Internal Rev. v. Hansen,* 360 US 446, 448, 79 SC 1270, 3 L Ed2d 1360 (1959):

"* * * The dealer and his customer agree upon a 'Cash Delivered Price' for a particular vehicle owned by the dealer. In part payment of that price the customer makes a down payment to the dealer in cash or 'trade-in,' or both. To the remaining balance of that cash price there is added the cost of insurance on the vehicle and a

'finance charge.' The aggregate is sometimes called the 'Deferred Balance.' It is evidenced and secured by an assignable or negotiable instrument retaining defeasible title to or a lien on the vehicle —generally on a form supplied by the finance company with which the dealer may then be doing business—and the instrument is signed by the customer, delivered to the dealer, and made payable to him in monthly installments over an agreed period—one to three years on automobiles and three to five years on house trailers. Thereupon, the dealer delivers the vehicle to his customer, with such memoranda or bill of sale as will enable him to register, license and use it.

"Soon after completion of these procedures, these dealers sell (discount), those instruments (hereafter called 'installment paper') to finance companies for an agreed or formula fixed price, and the dealers guarantee payment, in whole, or in part, of the installment paper.

"Under contracts between the * * * dealers and the finance companies * * * the latter, upon receipt and acceptance of installment paper, are obligated to pay immediately to the dealers a major percentage of the purchase price, but they are thereby also authorized to retain the remaining percentage of the price, and to credit it on their books to a 'Dealer's Reserve Account' in the name of the particular dealer, for the purpose of securing performance by him of his guarantor, endorser, and other liabilities to the finance company."

It is undisputed that it was necessary from time to time for the banks to draw upon these reserve accounts to offset the deficiencies resulting from defaults on the contracts purchased from the partnership. But since many of the contracts still had unpaid balances, the evidence could not show what the actual loss would be and thus, could not show the

amount that would remain in the reserves which could be reclaimed by the partnership or its successors. Plaintiff argues that since the full amount of the reserves were carried on the books and reported in the income tax returns by the partnership and corporate books that this full amount should be used in computing the partners' respective interests at dissolution. Plaintiff cites income tax cases which hold that dealer's reserve accounts are regarded as immediate income and assets to those dealers who maintain their books on an accrual basis. *Commissioner of Internal Rev. v. Hansen,* supra; *Schaeffer v. Commissioner of Internal Rev.,* 258 F2d 861 (6th Cir 1958). These cases are not controlling in evaluating the respective interests of partners in such reserves in a suit for an accounting brought by one of the partners. For tax purposes it may be reasonable for the government to require the dealer to report the entire contract balance even though a part of it may find its way into a reserve fund. The losses are deductible as they occur. When all of such losses have been deducted from the reserve account, we have the net value of the account to the depositor. This is the figure which, if available, would represent the true value of the account to the partnership; it was this value which the trial judge attempted to estimate in the present case. As we have already indicated, the value of such an account cannot be ascertained exactly while there are contracts outstanding. And there is no uniform criteria of appraisal, principally because of the great variation in the credit policy of the various dealers. However, there was testimony in this case that in the automobile sales business as a whole the loss experience has been approximately 5% of the unpaid balances

on the installment sales of new cars, and approximately 10% on the sales of used cars. Mr. Meltebeke, assistant cashier in charge of auto loans at the First State Bank of Milwaukie, in testifying with respect to losses on used cars, stated: "We have found that 10 per cent is a bare minimum. Now, through my experience, I have closed 14 dealers, and in that time I have only had one that got out with less than 10 per cent. This was on used-car dealers." The trial judge used this 10% average loss experience in computing the value of the Bend reserve account. He estimated that the account was worth 30% of its face value, based upon the following computation. The reserve account at the time of the dissolution of the partnership was $13,923.24. Thereafter, additions were made to the account and at the time the business was sold by Fitzpatrick in 1956, it contained approximately $20,000. Fitzpatrick had drawn $2,000 from the account. That withdrawal, together with payment of losses, reduced the account to $7,800. This amount of reserves covered $35,000 of outstanding contracts. Estimating that there would be a 10% loss on these contracts, the court reduced the $7,800 amount by $3,500, leaving $4,300. It was assumed that this amount represented the net value of the account to the partnership, and was the amount which would ultimately be available for withdrawal. Adding the $2,000 which Fitzpatrick had already withdrawn to the estimated net balance of $4,300, the value of the original reserve of $20,000 was computed to be $6,300, which would be approximately 30% of that original reserve. Using the same 30% proportion in evaluating the $13,923.24 reserve account at the time of dissolution, the trial court concluded that it was worth $4,176.97. We are of the

opinion that this amount represents the reasonable value of the reserve account.

The trial court held that the dealer reserves accumulated in connection with the Milwaukie operation had no value because the actual and contingent losses were equal to or greater than the reserves. We believe that this was a reasonable conclusion from the evidence. There was testimony showing specific losses on contracts covered by the Milwaukie reserves. The exact interest of the partnership in the reserves is difficult to ascertain because a part of the reserves is attributable to transactions antedating the formation of the partnership. The matter is further complicated by the fact that Fitzpatrick pledged to the Milwaukie bank the reserve account as security for contracts written by another dealer who had formerly operated the partnership's lot in Milwaukie.

Plaintiff takes the position that these reserves, as well as the reserves at Bend, should be included in the partnership accounting in the full amount that they appeared on the partnership books, without deduction for any losses or prospective liabilities. Plaintiff made no effort to prove that the offsets used by the trial court were not properly considered in arriving at the net value of the reserve account. The trial court's computation, although to some extent based upon inferences rather than direct evidence, appears to us to be reasonable and we hold, therefore, that the Milwaukie reserve account had no net value as a partnership asset.

The trial court ruled that Fitzpatrick was entitled to a salary from the partnership for the period from September 4, 1954 (the date on which the partnership was entered into) to February 5, 1955. During this period, Fitzpatrick alone conducted the partnership

business at Bend. McBride did not contribute his services to the partnership until February 5, 1955.

■ A partner is not entitled to remuneration for acting in the partnership business (ORS 68.310 (6)) in the absence of an agreement to the contrary. *In Re Berger's Estate,* 144 Or 631, 652-53, 25 P2d 138 (1933); *United Brokers' Co. v. Dose,* 143 Or 283, 285, 22 P2d 204 (1933); *Mann v. Flanagan,* 9 Or 425, 428-29 (1881). Such an agreement may be implied. *In Re Berger's Estate,* supra; *Mann v. Flanagan,* supra; *Levy v. Leavitt,* 257 NY 461, 178 NE 758 (1931); Crane, Partnership, § 65(c), pp 349-353 (1952). Fitzpatrick testified that he and McBride had an understanding that he, Fitzpatrick, would be entitled to draw a reasonable amount for living expenses until McBride began acting in the partnership business. McBride testified that he did not recall any conversation with Fitzpatrick concerning remuneration during the period in question. The partnership agreement provided as follows:

"That I, Ervin P. McBride will not expect to receive any remuneration until such time that I am putting in full time exclusively with Fitzpatrick Lincoln Mercury and Fitzpatrick Milwaukie Auto Sales."

McBride admitted that when he began participating in the partnership business there was an express agreement that each partner would draw $60 a week from the Bend business.

■ From these circumstances we believe that it is reasonable to infer that the parties intended to permit Fitzpatrick to make a reasonable withdrawal for living expenses during the time he was operating the Bend business without McBride's assistance. The provision of the partnership agreement set out above

lends support to this inference. The agreement made after McBride joined Fitzpatrick in Bend permitting the former to draw $60 a week is additional ground for inferring that the original agreement was intended to permit similar reasonable withdrawals by Fitzpatrick prior to McBride's participation in the affairs of the partnership. We hold that the trial court did not err in allowing a salary of $2,600 for the period in question.

■ The record in this case consists of approximately 1400 pages of testimony and voluminous exhibits. Consistent with our duty to review the case de novo, we have examined the record with care, giving particular attention to the testimony of the accountants which, ordinarily, affords the best prospect of reaching the truth in cases of this nature. The task was not easy. A part of the difficulty in judicially untangling the financial relationship of the parties can be charged to the plaintiff. The audit upon which he based his claims for specific losses did not, in several instances, present a realistic explanation for charging Fitzpatrick for those alleged losses and did so without any deduction for actual or expected losses which were to be expected in the normal course of business events. It may be conceded that defendant Fitzpatrick, having prima facie violated his fiduciary duty by reason of his dominant position coupled with his receipt of the major part of the assets upon dissolution, had the burden of going forward with the evidence to show that he did not, in the specific instance, take advantage of the plaintiff. *Townes v. Townes*, 270 F 744 (5th Cir 1921); *Gilbert & O'Callighan v. Anderson*, 73 N J Eq 243, 66 A 926 (1907). But this burden does not give the plaintiff a license to charge defendant with extravagant

claims. Defendant presented a reasonable explanation for the claimed deductions against the reserve accounts. Plaintiff, without any effort to assist the court in arriving at a reasonable value for these accounts, would have us disregard defendant's evidence of their net value and accept the untenable proposition that the reserves were worth the total amount credited to the accounts on the books. He is not entitled to such favored treatment. It is our conclusion that the trial court made a reasonable adjustment of the respective claims of the parties.

As we have indicated above, the decree should be modified to exclude the recitation that Paul F. Fitzpatrick was guilty of fraudulent conduct. As modified, the decree of the lower court is affirmed.